[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 436 
 On Applications for Rehearing
The opinion of October 31, 2003, is withdrawn, and the following is substituted therefor.
This appeal arises from a workers' compensation action in the Choctaw Circuit Court initiated in October 1997 by Linda Kirklewski ("the employee") against Fort James Pennington, Inc., now known as Fort James Operating Company ("the employer"). The employee alleged that she was rendered permanently and totally disabled as a result of a workplace injury to her back suffered on March 2, 1994. The employer filed an answer admitting that the back injury had occurred, that the employer had been notified of the injury, and that the employer had paid workers' compensation benefits for that injury; the employer denied the remaining allegations of the complaint and asserted certain affirmative defenses. The employer amended its answer in February 2001 and asserted various additional affirmative defenses. On October 11, 2001, one week before trial, the employer filed a motion to amend its answer a second time to assert that the employee's disability arose from a preexisting condition and that any workers' compensation benefits awarded by the court should be "apportioned" pursuant to §§ 25-5-57 and 25-5-58, Ala. Code 1975; after the employee objected to the employer's motion to amend, the trial court denied the motion immediately before receiving evidence at trial.
The case was tried on October 18, 2001; during that ore tenus proceeding, the trial court received testimony from the employee and her vocational consultant, as well as from the employer's occupational therapist, its nurse, its medical-services supervisor, its human-resources coordinator, and its vocational consultant. In addition to the testimony and exhibits admitted into evidence at trial, the trial court permitted the introduction of deposition testimony and documentation concerning a retirement plan under which the employee had been receiving benefit payments following her workplace injury. The trial court ultimately entered a judgment on September 5, 2002, stating that court's findings of fact and conclusions of law and awarding the employee permanent total disability benefits under the Workers' Compensation Act (§ 25-5-1 et seq., Ala. Code 1975). The employer's postjudgment motions, filed pursuant to Rules 52 and 59, Ala. R. Civ. P., were subsequently denied by operation of law pursuant to Rule 59.1, Ala. R. Civ. P. The employer appeals.
 Standard of Review
This court will not reverse a judgment based on the factual findings of the trial court in a workers' compensation case if those findings are supported by *Page 437 
"substantial evidence." Ala. Code 1975, § 25-5-81(e)(2). "Substantial evidence" is "`evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'" Ex parte Trinity Indus., Inc., 680 So.2d 262, 268
(Ala. 1996) (quoting West v. Founders Life Assurance Co. ofFlorida, 547 So.2d 870, 871 (Ala. 1989)). Pursuant to that principle of review, "`the trial court's findings on disputed evidence in a workers' compensation case are conclusive,'" and this court must not "`weigh the evidence before the trial court.'" Ex parte Golden Poultry Co., 772 So.2d 1175, 1176
(Ala. 2000) (quoting Ex parte Ellenburg, 627 So.2d 398, 399
(Ala. 1993), and Edwards v. Jesse Stutts, Inc., 655 So.2d 1012,1014 (Ala.Civ.App. 1995)); see also Ex parte Holton,886 So.2d 83, 84-85 (Ala. 2003). Moreover, we must "consider the evidence in a light most favorable to the findings of the trial court."Ex parte Staggs, 825 So.2d 820, 822 n. 1 (Ala. 2001). However, our review as to purely legal issues is without a presumption of correctness. See Holy Family Catholic School v. Boley,847 So.2d 371, 374 (Ala.Civ.App. 2002) (citing § 25-5-81(e)(1), Ala. Code 1975).
 Medical Causation
The employer first contends that the employee did not adduce substantial evidence of medical causation. In HookerConstruction, Inc. v. Walker, 825 So.2d 838 (Ala.Civ.App. 2001), we briefly summarized the following pertinent principles of Alabama law regarding causation in a workers' compensation case:
 "`For an injury to be compensable, it must be "caused by an accident arising out of and in the course of" the employee's employment. § 25-5-51, Ala. Code 1975. The phrase "arising out of" an employee's employment requires a causal connection between the injury and the employment. The phrase "in the course of" the employee's employment refers to the time, place, and circumstances under which the accident occurred. In accidental cases, i.e., those involving a sudden and traumatic event, an employee must produce substantial evidence tending to show that the alleged accident occurred and must also establish medical causation by showing that the accident caused or was a contributing cause of the injury. Medical causation may be found by the trial court without testimony from medical doctors. The totality of the evidence, including both lay and expert testimony, may satisfy a showing of medical causation.'"
825 So.2d at 842 (quoting Pair v. Jacks' Family Rests., Inc.,765 So.2d 678, 681 (Ala.Civ.App. 2000)).
In this case, the employee claimed that on three particular occasions she was involved in accidents at work that caused or contributed to cause a disabling injury to her back. The employee adduced evidence at trial tending to show that on March 2, 1994, while working at the employer's paper plant as a "wrapper-reliever," she had an accident while in the line and scope of her employment; on that date, she attempted to lift a buggy filled with culled paper products (referred to by the parties and hereinafter referred to as "broke") weighing 75 pounds before her coworker was prepared to help her carry out the lifting maneuver. At that moment, the employee began suffering pain in her lower back, and, over the course of the following weeks, she began suffering pain in her hip and pain radiating down her right leg; an orthopedist diagnosed the employee at that time as having suffered a muscle strain. *Page 438 
The employee testified that before the March 2, 1994, accident, she had not experienced any significant back problems other than a single problem that had occurred between 8 and 13 years before the March 1994 accident; however, according to the employee, that problem had resolved itself within 2 days and did not cause the employee to miss work. After the March 2, 1994, accident, the employee sought and obtained medical treatment and was paid compensation pursuant to the Workers' Compensation Act; she later returned to work for the employer subject to limitations as to lifting, bending, twisting, climbing, and crawling, which necessitated her placement in an "inspector" job instead of her former job. However, that job was later eliminated, and the employee was reassigned first to a paper-testing position and then to a job on the employer's "yard crew," which required lifting.
The employee testified that a second workplace accident occurred on January 1, 1996. On that day, the employee was assigned to work cleaning a control room, which included cleaning broke from a room using a shovel. In the process of cleaning that room, the employee encountered a round metallic object that had been covered in paper pulp and had been propped against a wall. Misjudging the object to be a relatively light drum lid, the employee grasped the object and tried to lift it; however, she discovered in mid-lift that the object was, in fact, a relatively heavy manhole cover that was about to drop onto her foot. In preventing the cover from falling on her foot, the employee injured her back, causing the same back-pain symptoms that she had experienced after her March 2, 1994, accident and causing pain to radiate down both of her legs. The employee received workers' compensation payments after that injury.
The employee underwent medical treatment after the January 1, 1996, accident, but she continued to experience symptoms of pain for over a month after the accident. On February 20, 1996, the employee visited her family physician, Dr. Katherine Hensleigh, who responded to the employee's insistence that the cause of her continued symptoms be found so that she could return to work. Dr. Hensleigh ordered a magnetic resonance image ("MRI") of the employee's back, the first such diagnostic procedure performed since the employee's March 2, 1994, injury. The MRI revealed a disk herniation between the employee's third and fourth lumbar vertebrae and a disk bulge between the employee's fourth and fifth lumbar vertebrae. The employee underwent an epidural block to alleviate her back pain, but that procedure did not afford enduring relief; the employee also underwent physical therapy and treatment for depression.
In October 1996, the employee returned to work in a transitional work program. Approximately two months after returning to work, on January 3, 1997, the employee again began experiencing severe back pain after two to three hours of shoveling broke in the employer's control room; after having reported the onset of symptoms to the employer, the employee underwent another MRI, which revealed two disk ruptures. The employee was referred to Dr. Ferrell Allen, a neurologist, who undertook nerve-conduction and electromyography ("EMG") tests that showed a slowing of sensory nerve-conduction velocity and diminished nerve supply in both of the employee's legs, which Dr. Allen attributed to disk herniation at the level of the employee's third and fourth lumbar vertebrae. The employee was also diagnosed with an acute traumatic disk bulge at the level of the fourth and fifth lumbar vertebrae and bilateral radiculopathy (pinched nerves). Dr. Evan Zeiger, a neurosurgeon to whom *Page 439 
the employee was referred, ordered a lumbar myelogram and a computerized tomographic scan ("CT scan"), which confirmed Dr. Allen's diagnosis. An orthopedic surgeon, Dr. Donald E. Cook, took X-rays of the employee's back in October 1997 that revealed that the employee's back had undergone changes that exceeded normal wear and tear; he diagnosed the employee as having a lumbar diskogenic disorder with intermittent nerve compression.
The employer contends that the accidents occurring on March 2, 1994, January 1, 1996, and January 3, 1997, did not produce a permanent injury. In so contending, the employer relies upon testimony given by Dr. Hensleigh at her January 17, 2001, deposition (i.e., her second deposition in the case), at which she opined that a workplace accident purportedly occurring on February 19, 1996, but not reported to the employer, probably caused the employee's herniated disk.
However, there is substantial evidence upon which the trial court could properly have relied in rejecting the employer's contention. First, the employee denied having been involved in any accident on February 19, 1996. Moreover, three of the employee's treating physicians — Dr. Allen, Dr. Zeiger, and Dr. Cook — all opined that the employee's back injury was primarily caused by the March 2, 1994, accident. While the employer challenges the correctness of those treating doctors' conclusions, arguing that those opinions are based upon "mistaken understandings" about the employee's medical history taken from their interviews of the employee and that they are not based upon the employee's medical records, as Dr. Hensleigh's opinion is, those objections go solely to the weight to be accorded those doctors' opinions. See Emerik Props. Corp. v. Jefferson CountyBd. of Equalization Adjustments, 591 So.2d 496, 498
(Ala.Civ.App. 1991) (differences in testimony of expert witnesses, as well as objections to expert testimony on grounds of inadequacy of fact, pertain to weight and not admissibility). Finally, Dr. Hensleigh herself testified that ruptured disks commonly can be asymptomatic, and she admitted that she could not say precisely when the employee had suffered the disk rupture.
Our Supreme Court has stressed that "[t]he Court of Civil Appeals is authorized to determine whether the trial court's decision is supported by sufficient evidence, but it is not authorized to independently weigh the evidence." Ex parte GoldenPoultry Co., 772 So.2d at 1177. Given that lay and expert evidence supports the trial court's determination that the employee's back injury resulted from the March 2, 1994, accident, as aggravated by the January 1, 1996, and January 3, 1997, accidents, we reject the employer's contention that substantial evidence was not presented that those accidents caused or contributed to cause an injury to the employee.
 Permanent and Total Disability
The employer also contends that the trial court erred in determining that the employee was permanently and totally disabled and in awarding benefits accordingly. Specifically, the employer argues that (1) the employee's disability is caused by nonoccupational conditions; (2) the employee could not properly be found permanently and totally disabled under § 25-5-57(a)(4)d., Ala. Code 1975, which provides that "[a]ny employee whose disability results from an injury or impairment and who shall have refused to undergo physical or vocational rehabilitation or to accept reasonable accommodation shall not be deemed permanently and totally disabled"; and (3) the employee is disqualified from receiving benefits pursuant to *Page 440 
§ 25-5-77(b), Ala. Code 1975, which provides that where an injured employee refuses to comply with a reasonable request for examination or refuses medical services furnished by an employer, an employee's right to compensation shall be suspended. We will address these arguments in turn.
The employer's first challenge to the permanent total disability determination focuses on potential differential causes of the employee's inability to work. As to that issue, the record reveals that the employee testified that as a consequence of the injuries she suffered as a result of the March 2, 1994, accident, she has constant, sometimes severe, pain in her back radiating into her hip and legs, as well as leg weakness. The employee testified that on some days, usually between 10 and 12 days per month, she cannot arise from bed and that on other days she has to lie down 2 or 3 times for periods of between 15 and 120 minutes; her pain, she testified, is exacerbated by "a lot of walking or bending or twisting." The employee could not, as of the time of trial, stand for longer than 15-30 minutes, walk for longer than 30-45 minutes, lift more than 25 pounds on occasion, sit for a prolonged period, or kneel or squat to any significant extent.
Dr. Cook, the orthopedic surgeon who examined the employee in October 1997 (approximately 10 months after the last of the accidents made the basis of the employee's claim), testified by deposition that, in addition to taking X-ray images, he had conducted a physical examination of the employee's back and legs and a neurological and circulatory examination of the employee's legs, concluding that the employee had lost motion in her back. Dr. Cook opined that the loss in range of motion in the employee's back was primarily caused by the injury the employee suffered in March 1994 and that her condition is permanent; he added that although the employee might adapt somewhat to her pain her overall capability would probably not increase. Moreover, Dr. Cook opined that it was "highly unlikely" that the employee could perform the same type of work as before her injury and that the employee would not be able to perform any employment on a consistent basis that required repetitive or heavy lifting, bending, twisting, turning, kneeling, squatting, climbing, strenuous use of her arms, staying in a fixed position for long periods of time, operating foot pedals, or being near vibrating equipment. Dr. Cook assigned the employee a 15% medical-impairment rating.
Similarly, Dr. Allen, the employee's neurologist, testified by deposition that the employee's disk herniation occurred in March 1994 and was exacerbated in January 1996. That herniation, he testified, "resulted in limited range of motion of the lumbar spine," "atrophy in the . . . muscles of the legs and feet," "loss of reflexes at the ankles," "weakness in the right leg," and "pain in the low back and both legs." Dr. Allen opined that the employee's radicular, or radiating-pain, symptoms arose from her January 1996 re-injury. Based upon his own observations and the results of procedures conducted by Dr. Zeiger, Dr. Allen assigned the employee a 25% medical-impairment rating.
The employer relies on a report of a functional-capacities evaluation from 1997 indicating that the employee might be capable of medium-level work and on testimony from Dr. Hensleigh to the effect that if the employee had returned to work in 1997 after her third accident, the employee's condition might have improved.[1] In *Page 441 
essence, the employer blames the employee's disability not upon the employee's workplace injuries themselves, but upon degenerative changes in her spine purportedly accelerated by the employee's having added weight to her frame after the injuries. However, Dr. Allen testified that in reviewing the employee's February 1996 MRI, he had not seen any evidence of degenerative disease, and both Dr. Cook and Dr. Allen attributed the employee's disability to her workplace injuries. Thus, we conclude that the trial court did not err in determining that the employee's disability resulted from her workplace injuries and not from other causes.
The employer also argues for the applicability of § 25-5-57(a)(4)d., which prevents a finding of permanent and total disability where an employee has refused to undergo physical or vocational rehabilitation or to accept "reasonable accommodation." The employer's argument in this regard focuses on whether the employer, in fact, "reasonably accommodated" the employee's disability by offering employment within the employee's capabilities and whether the employee had the burden, under that statute, of demonstrating that she had sought other employment.
The refusal-of-reasonable-accommodation provision of § 25-5-57(a)(4)d., which pertains to permanent and total
disability, is analogous to § 25-5-57(a)(3)e., which bars an employee from recovering workers' compensation benefits based upon a permanent partial disability when the employee has unjustifiably refused "employment suitable to his or her capacity offered to or procured for him or her." The employer has cited a number of cases from other states for the proposition that an employee may not prevail upon a claim that no "suitable employment" exists (and, thus, that that employee has not "refused" such employment) unless that employee has "marketed" any residual earning capacity remaining after a workplace injury or has shown that work is not available in light of the employee's reduced capacity.
In their treatise on American workers' compensation law, Professor Arthur Larson and Lex K. Larson discuss what is called the "odd-lot" doctrine, under which total disability may be found even where an employee is not totally incapacitated for work where that employee is so handicapped that he or she will not be employed regularly in any well-known branch of the labor market. 4 Arthur Larson Lex K. Larson, Larson's Workers' CompensationLaw § 83.01 (2003). This principle, although not referred to by that name, is recognized in Alabama in that permanent and total disability "does not mean absolute helplessness or entire
physical disability." Lewis G. Reed Sons, Inc. v. Wimbley,533 So.2d 628, 631 (Ala.Civ.App. 1988) (emphasis added). Rather, "[t]he test for permanent total disability is the inability to perform one's trade and the inability to find gainful employment." TAJ-Rack Div., Inc. v. Harris, 603 So.2d 1061,1064 (Ala.Civ.App. 1992) (citing Mead Paper Co. v. Brizendine,575 So.2d 571 (Ala.Civ.App. 1990)).
The general principles governing the respective burdens of an employee and an employer concerning the availability of suitable work have been synthesized as follows:
 "If the evidence of degree of obvious physical impairment, coupled with other facts such as claimant's mental capacity, education, training, or age, places claimant prima facie in the odd-lot category, the burden should be on the employer to show that some kind of suitable work is regularly and continuously available to the claimant." *Page 442 
4 Larson's Workers' Compensation Law § 84.01[3] (footnotes omitted). However, as that treatise goes on to explain,
 "[i]f the claimant's medical impairment is so limited or specialized in nature that he or she is not obviously unemployable or relegated to the odd-lot category, it is not unreasonable to place the burden of proof on that claimant to establish unavailability of work to a person in his or her circumstances."
Id. at § 84.01[4] (footnote omitted).
In this case, the employee adduced evidence of physical and vocational impairment so as to make a prima facie showing of her incapacity to hold regular employment. In addition to the lay and medical testimony we have already recounted concerning the employee's medical condition, we note that the employee testified that in her condition she could not perform any of the jobs potentially available at the employer's plant or in the same general geographic area; she testified that on the 10 to 12 days per month, on average, during which she experiences the maximum level of pain and discomfort, she would not be able to report to a job at all. The employee's vocational consultant, Bill Vinson, testified that he had interviewed the employee and had administered an academic test to the employee that had revealed her academic aptitude to be at the high-school level. Vinson opined that the employee's age (50 years old) was "occupationally and vocationally significant in that it narrows down [one's] choices." He further opined that the employee lived in a rural location with a low population density and a low variety of jobs; moreover, he testified that no employer would likely employ a person who needed to lie down on multiple occasions and required 10 to 12 days off from work each month. It was Vinson's opinion that the employee was totally vocationally disabled.
In response to the employee's prima facie showing, the employer sought to show that the employee could have worked at its plant in a job that accommodated her physical limitations; specifically, the employer indicates that a position as a "roll-haul" operator, which involved operating a "tow motor," was available in September 1997 and was offered to, but was purportedly unreasonably refused by, the employee. However, the evidence is undisputed that the roll-haul-operator position was not actually "available" to the employee; rather, another employee with greater seniority was entitled to, and did, fill that position. After that position had been filled by the more senior employee, the employer made no further positions available to the employee. There was also evidence before the trial court that, despite the employee's willingness to attempt to return to work at that time, the employer canceled a meeting set for September 26, 1997, to discuss the employee's work status after she had requested to have an attorney accompany her to the meeting and that the employer never scheduled any other meetings after that cancellation.[2]
Although there was also evidence before the trial court from which that court could have concluded that the employee, not the employer, canceled the meeting to discuss possible openings for the employee, there is substantial evidence that supports the trial court's judgment that the meeting was canceled by the employer and that the employer did not offer the employee a position that she could *Page 443 
have performed. Moreover, there was substantial evidence that the employee could not have obtained work from other employers that was suited to her medical and vocational condition. Thus, while we might not necessarily have reached the same judgment as the trial court in this case, our standard of review does not allow substitution of our judgment for that of the trial court where the trial court's judgment is supported by substantial evidence.See Ala. Code 1975, § 25-5-81(e)(2).
The employer also asserts that the employee has refused to submit to a medical examination by Dr. Zeiger that the employer had requested and that the employee has refused medical treatment; it argues that under § 25-5-77(b), Ala. Code 1975, it is entitled to withhold payment of benefits otherwise payable under the Workers' Compensation Act because of those actions.
With respect to the employee's refusal to submit to an examination by Dr. Zeiger (who last treated the employee in 1997), we note that "[t]he threshold determination of thereasonableness of the employer's request [for an examination], and thus of the reasonableness of any refusal of the employee to submit to an examination, is `a question of fact for the trier of fact,'" i.e., the trial court. Jimoco, Inc. v. Smith,777 So.2d 716, 718 (Ala.Civ.App. 2000) (quoting Health Care Auth. ofHuntsville v. Henry, 600 So.2d 324, 327 (Ala.Civ.App. 1992)). The employer relies upon a portion of Dr. Zeiger's deposition testimony to the effect that he had recommended that the employee undergo surgery only if the employee "was in intractable pain," which the employer contends has occurred. However, the employee testified that Dr. Zeiger had informed her that surgery, if undertaken, would not cure her condition and would probably require follow-up surgical procedures. Moreover, Dr. Cook, the employee's orthopedist, testified that he had informed the employee that surgery had only a "50-50" chance of helping her back pain, and he opined that it would be "highly unlikely" that surgery would restore the employee to significant gainful employment. Thus, there is substantial evidence in the record tending to show that the examination proposed by the employer could not be reasonably expected to improve the employee's condition, and no reversible error is therefore presented as to that issue. Jimoco, 777 So.2d at 718.
The employer also contends that because the employee did not lose weight after certain of her physicians recommended that she lose weight, § 25-5-77(b) applies so as to require suspension of benefits. There is some Alabama authority for the proposition that refusal to make "lifestyle changes" recommended by doctors in order to facilitate a recovery will warrant suspension of benefits where an employee's behavior is the cause of the employee's disability and where that refusal prevents an injured employee from reaching maximum medical improvement. MikeMakemson Logging v. Colburn, 600 So.2d 1049, 1050-51
(Ala.Civ.App. 1992) (per Russell, J., with Thigpen, J., concurring and Robertson, P.J., dissenting). However, the employee testified in this case that, although she had been advised to lose weight, she had not been advised by any doctor that weight loss would take care of her back problem; indeed, Dr. Cook testified that it was "highly unlikely" that any treatment would be able to return the employee to employment. Under these circumstances, we conclude that Colburn is distinguishable and that the trial court did not err in rejecting the employer's argument that § 25-5-77(b) mandated suspension of benefits. *Page 444 
 Apportionment
The employer further contends that the trial court erred in failing to "apportion" liability for the employee's injury between occupational and nonoccupational causes, citing §25-5-58, Ala. Code 1975. That Code section provides that if the degree or the duration of a disability resulting from a workplace accident is magnified or is prolonged because of a "preexisting injury or infirmity," an employer "shall be liable only for the disability that would have resulted from the accident had the earlier injury or infirmity not existed."
Assuming, without deciding, that this court may properly reach that issue, despite the trial court's denial of the employer's motion to amend its answer so as to raise apportionment as an affirmative defense, it is well settled that that section is not applicable where the earlier injury or infirmity relied upon by the employer was not so disabling as to prevent the employee from performing the normal duties of his employment. E.g., R.L.Carnes Logging Contractors, Inc. v. Whitsett, 844 So.2d 1248,1254 (Ala.Civ.App. 2002) (citing Boothe v. Jim Walter Res.,Inc., 660 So.2d 604 (Ala.Civ.App. 1995)); see also Ex parteBratton, 678 So.2d 1079 (Ala. 1996). In this case, while the employee admitted to having had certain back problems during the 1980s, she testified that those earlier problems had been resolved and, more importantly, that those problems had not prevented her from performing her work for the employer before her March 2, 1994, accident. Further, as we have noted, Dr. Allen testified that he had seen no indication of degenerative disk disease in the employee's 1996 MRI, which was taken after two of the employee's three workplace accidents. We agree with the employee that any possible degenerative disk disease that might have been present before that accident could properly have been found by the trial court not to have been so disabling as to prevent the employee from performing the normal duties of her employment and, therefore, that liability was not due to be "apportioned" to the employee.
 Other Issues
The employer raises two final issues that have recently been authoritatively resolved by our decision in Fort James OperatingCo. v. Irby, [Ms. 2020598, Jan. 9, 2004] ___ So.2d ___ (Ala.Civ.App. 2004). The first of these concerns the employer's right to a credit based upon the employee's receipt of disability-retirement benefits from the Paper Industry Union Management Pension Fund, which is also known as the PACE fund. The record in this case reveals that the employee applied for and received disability-retirement benefits from the PACE fund in the amount of $327 per month beginning in November 1997, when she was 47 years, 11 months old; those monthly benefits increased to $345 in June 1998. Although the employee would not have begun to draw full retirement benefits until attaining age 65 (or reduced "early-retirement" benefits until attaining age 55), the employee has received full retirement benefits based upon her 11.25 years of service by virtue of her disability.
In Irby, we noted that § 25-5-57(c)(1) specifically permits an employer to reduce the amount of benefits paid pursuant to a "`disability plan, retirement plan, or other plan providing for sick pay by the amount of compensation paid'" if the employer "`pa[ys] for the plan or plans providing the benefits deducted.'" ___ So.2d at ___. We also discussed pertinent Alabama cases construing the scope of that right of setoff, including Ex parteDunlop Tire Corp., 706 So.2d 729 (Ala. 1997), Ex parte Taylor,728 So.2d 635 (Ala. 1998), and *Page 445 Cross v. Goodyear Tire Rubber Corp., 793 So.2d 791
(Ala.Civ.App. 2000). Irby, ___ So.2d at ___. We then noted that the PACE plan was "substantially similar" to the disability-retirement plan held to afford a right of setoff inCross in that the benefits paid to an employee under the PACE plan "are not based solely on [that employee's] age and length of service," and that "the disability-retirement benefits are paid . . . as a result of his [or her] disability." Irby, ___ So.2d at ___. We therefore concluded that the employer was entitled to a setoff with respect to its duty to pay workers' compensation benefits to an injured worker to the extent that the employee's disability-retirement benefits exceeded retirement benefits that that worker would have received had he "retired solely because of his age and length of service." Id. at ___.
Here, the employee elected to seek disability-retirement benefits, and she has received disability-retirement benefits since November 1997. Until the employee reaches age 55, none of the monthly disability-retirement benefits she is receiving can properly be considered a "regular" retirement benefit immune from setoff under § 25-5-57(c)(1) as construed in Ex parte Taylor
and Cross. As we did in Irby, we conclude that the employer is entitled by statute to a setoff with respect to that portion of the employee's disability-retirement benefits that exceeds the amount that the employee could properly draw under the provisions of the PACE plan upon the attainment of age 55 (with respect to early-retirement benefits) or age 65 (with respect to full-retirement benefits). See also Cross, 793 So.2d at 794-95. To the extent that the trial court denied the employer the setoff permitted under § 25-5-57(c)(1) for "disability plan" and "retirement plan" payments from the PACE plan that exceed the employee's entitlement to "regular" retirement benefits, that court erred to reversal.
Finally, the employer argues that the trial court's judgment improperly awarded permanent total disability benefits without appropriate limitations. Our review of the trial court's judgment reveals that it awards the employee (a) all compensation previously paid by the employer, as well as $107,683 as accrued compensation for the period between September 27, 1997, to September 5, 2002 (less attorney fees of 15%); (b) future medical benefits; (c) future compensation for total disability at $356.15 per week beginning on September 12, 2002; and (d) "[o]ther benefits" provided for by the workers' compensation laws of Alabama. In Irby, we concluded that a similar judgment awarding "`other benefits as provided by the workers' compensation law of Alabama,'" ___ So.2d at ___, did not warrant reversal in that Alabama's Workers' Compensation Act "limits the recovery of workers' compensation benefits to periods of disability." ___ So.2d at ___. Likewise, we conclude that the trial court's judgment in this case sufficiently incorporates the concept that the employee is entitled to benefits only during the duration of her permanent disability.[3]
 Conclusion
To the extent that the trial court denied a setoff to the employer with respect to the disability-retirement payments to the employee made by the PACE plan, its judgment is reversed. In all other respects, *Page 446 
the judgment of the trial court is affirmed. The cause is remanded for further proceedings consistent with this opinion.
OPINION OF OCTOBER 31, 2003, WITHDRAWN; OPINION SUBSTITUTED; FORT JAMES OPERATING COMPANY'S MOTION TO STRIKE KIRKLEWSKI'S APPLICATION FOR REHEARING DENIED; APPLICATIONS DENIED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
YATES, P.J., and CRAWLEY, THOMPSON, and MURDOCK, JJ., concur.
[1] Dr. Hensleigh admitted, however, that as of the date of her 2001 deposition, the employee was totally disabled and could not work.
[2] The employer's workers' compensation administrator refused to pay further disability benefits after that date, based upon the employee's "failure to return" to the unavailable roll-haul-operator position and the employee's having failed to meet with the employer's representative.
[3] Of course, the employer may properly seek to alter, amend, or vacate the trial court's judgment if the disability that the trial court has determined to exist in this case should cease to be a permanent total disability in the future. See MayfieldTrucking Co. v. Napier, 724 So.2d 22 (Ala.Civ.App. 1998), and § 25-5-57(a)(4)b., Ala. Code 1975.