Like the late Justice Richard Jones in Insurance Co. of NorthAmerica v. Citizensbank of Thomasville, 491 So.2d 880, 886 (Ala. 1986) (Jones, J., concurring in part and dissenting in part), "I prepared . . . a proposed opinion dealing with [a] case as I thought it should be dealt with," but in this case, like Justice Jones in Citizensbank, I lost. Following his example, I "now set out that rejected opinion as a full expression of my views on the issues here presented." Id.
 "Under the Alabama Workers' Compensation Act (`the Act'), Ala. Code 1975, § 25-5-1 et seq., `[a]ny employee whose disability results from an injury or impairment and who shall have refused to undergo physical or vocational rehabilitation or to accept reasonable accommodation shall not be deemed permanently and totally disabled.' Ala. Code 1975, § 25-5-57(a)(4)d. This appeal involves the scope and effect of that provision of the Act.
 "In February 2001, Harold Peebles (`the employee') filed a civil action in the Walker Circuit Court against Clear Creek Transportation, Inc., and Skilstaf, Inc. (`the employers'),¹ seeking benefits under the Act based upon an alleged work-related injury that had purportedly occurred in May 1999. The cause was transferred to the Lawrence Circuit Court (`the trial court') in May 2001, after which the employers answered the complaint. After an ore tenus proceeding, the trial court entered a judgment in which it determined that the employee had suffered a permanent and total disability. As a component of its judgment, the trial court concluded that the employee had not refused `suitable employment' because he `ha[d] not been offered a job by any employer since' the date of his injury, that the employers had not offered vocational rehabilitation `in a manner as defined by the . . . Act,' and that the employee was `incapable of gainful employment and earning a living' even if such vocational rehabilitation were to be offered. The employers moved for a new trial or, in the alternative, to alter, amend, or vacate the judgment, contending, among other things, that the trial court had erred in concluding that the employee was permanently and totally disabled; the trial court denied that motion in pertinent part. The employers appeal.
 "This court will not reverse a judgment based on the factual findings of the trial court in a workers' compensation case if those findings are supported by *Page 1067 
`substantial evidence.' Ala. Code 1975, § 25-5-81(e)(2). `Substantial evidence' is `"evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved."' Ex parte Trinity Indus., Inc., 680 So.2d 262, 268 (Ala. 1996) (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)). Pursuant to that principle of review, `"the trial court's findings on disputed evidence in a workers' compensation case are conclusive,"' and this court must not `"weigh the evidence before the trial court."' Ex parte Golden Poultry Co., 772 So.2d 1175, 1176 (Ala. 2000) (quoting Ex parte Ellenburg, 627 So.2d 398, 399 (Ala. 1993), and Edwards v. Jesse Stutts, Inc., 655 So.2d 1012, 1014 (Ala.Civ.App. 1995)). In contrast, our review as to purely legal issues is without a presumption of correctness. See Holy Family Catholic School v. Boley, 847 So.2d 371, 374 (Ala.Civ.App. 2002), and Ala. Code 1975, § 25-5-81(e)(1).
 "The employers' principal substantive objection² to the trial court's judgment concerns its award of permanent and total disability benefits under the Act based upon a conclusion that the employee did not refuse suitable employment or vocational rehabilitation. The employers cite § 25-5-57(a)(3)e., Ala. Code 1975, for the proposition that an injured employee is not entitled to compensation under the Act if he or she unjustifiably `refuses employment suitable to his or her capacity offered to or procured for him or her.' As a technical matter, the subsection cited by the employers pertains to permanent partial disability benefits, not to awards based upon permanent and total disability. However, as we recently noted in Fort James Operating Co. v. Kirklewski, 893 So.2d 434, 441
(Ala.Civ.App. 2004), that portion of § 25-5-57(a)(4)d. that `prevents a finding of permanent and total disability where an employee has refused to undergo physical or vocational rehabilitation or to accept "reasonable accommodation'" is `analogous to § 25-5-57(a)(3)e.' in the context of a claimed permanent and total disability. Thus, we must consider whether, in light of the evidence presented by the parties, the trial court's determination of permanent and total disability is consistent with § 25-5-57(a)(4)d.
 "The record reveals that on May 24, 1999, the employee, who was 58 years old at the time, was working as a delivery-truck driver in the line and scope of his employment by the employers when he slipped inside a trailer, fell, and injured his neck, his right shoulder, and his rib cage. Although the employee completed his work duties and drove himself home that day, he reported to a hospital on the following day, where he was diagnosed with a separation of the acromioclavicular joint and was prescribed analgesic medicine. In November 1999, after experiencing severe pain in his neck, arms, and legs, Dr. Joel D. Pickett successfully operated on the employee to repair a cervical-disk herniation and to remove bone spurs apparently caused by his fall; the employee then underwent physical therapy and a functional-capacities evaluation (`FCE') in early 2000. During the FCE, the employee reported experiencing severe pain, although he later reported not having problems completing the FCE. Moreover, the employee was described by the evaluating therapist as not having expended consistent effort during the FCE, a fact that the employee's treating physician, Dr. Eric Beck, noted as an `indicator of symptom magnification.' In *Page 1068 
mid-April 2000, Dr. Beck assigned the employee a 15% physical-impairment rating and opined that the employee had reached maximum medical improvement ("MMI"); Dr. Beck placed no work restrictions on the employee's sitting, standing, walking, fingering, pinching, or gripping, and indicated that the employee could perform jobs requiring him occasionally to lift 30 pounds and frequently to lift 15 pounds.
 "Although the employee was released to return to work in April 2000, he did not return to work for the employers because, he said, he had been terminated from their employment because he had `had too many insurance claims'; the employee did not seek out or accept any other work. The employee consulted Dr. Cyrus Ghavam, an orthopedic surgeon, in June 2000; Dr. Ghavam diagnosed the employee as having cervical stenosis and recommended further surgery. In October 2000, after the employee had been found disabled by the federal Social Security Administration, the employee underwent a second surgery performed by Dr. Pickett, a cervical microlanotomy, in an effort to remove bone matter in the area of his cervical nerves. After that surgery, Dr. Pickett indicated that the employee would reach MMI on January 13, 2001, that he could resume his normal activities as of that date, and that the employee had suffered a permanent physical impairment of 11%.
 "Despite these medical procedures, the employee continued to complain of chronic neck pain and parasthesias (i.e., episodes of tingling) in all four of his bodily extremities. Dr. Pickett referred the employee back to Dr. Beck for reevaluation; after electrodiagnostic testing, Dr. Beck found no evidence of a pinched nerve and again assigned the employee a 15% permanent-impairment rating. However, the employee continued to complain of neck pain and limitations in his ability to move his neck laterally or upward.
 "After litigation had arisen between the employee and the employers, Dr. Beck requested that the employee undergo a second FCE in June 2002. In his report of that FCE, which Dr. Beck himself conducted, Dr. Beck indicated that the employee's `Spurling's test' was negative bilaterally, which indicated no ongoing neural compression. Moreover, the employee again exhibited equivocal effort, and he declined to complete a modified step test because he reported having heard a popping sound in his neck. After the second FCE, Dr. Beck opined that the employee should have absolutely no restrictions on sitting, standing, walking, squatting, or balancing; however, the employee was also determined to be able to occasionally lift up to 15 pounds and to be able to frequently lift up to 10 pounds, which were somewhat lighter weights than Dr. Beck considered within the employee's capacities in April 2001.
 "In the spring of 2002, Skilstaf's workers' compensation insurance carrier retained the services of Re-Employment Services ("RES"), a company founded in 1995 by Gordon R. Butler that claims to specialize `in matching [an] injured worker's physical capabilities to job opportunities.' RES conducted a labor-market survey of the geographic area located within a 30-mile radius of the employee's home to locate specific unfilled jobs³ that the employee would be capable of performing in his injured state. RES located eight open positions as to which the pertinent hiring authorities indicated that the employee would be capable of performing the work involved; those positions involved work as *Page 1069 
an insurance salesperson, a telephone operator (two openings), an automobile salesperson (two openings), a telephone solicitor, a financial-institution manager, and a check-collection clerk.
 "After conducting its initial survey, RES contacted Dr. Beck and requested that he review the survey and opine whether the employee could perform the tasks required in each of the positions located. Dr. Beck deferred responding to RES until after the second FCE had been conducted, whereupon Dr. Beck indicated that each of the positions was appropriate for the employee so long as the employee did not have to lift more than 15 pounds. Dr. Beck later approved five of six other positions located by RES, including positions as a recreation attendant, a security guard (two positions), a retail-sales representative, a customer-service representative, and a dump-truck driver, as being within the employee's capabilities. Butler described the positions that RES had located for the employee as being `semi-skilled' with the availability of on-the-job training.
 "On July 9, 2002, RES sent a letter via facsimile to the attorney representing the employee in this action indicating that RES was in the process of finding employment opportunities for the employee; in that letter, RES requested permission to interview the employee to determine `not only his wants and desires but his educational level, work experience, military service,' and other employment-related factors. Counsel for the employee denied RES permission to contact the employee, and the employee testified at trial that he had personally received no notice of RES's job-search efforts.
 "RES then began sending notices to the employee's counsel addressed to the employee notifying him of various job interviews that RES had scheduled with the six prospective employers it had most recently contacted; between July 12 and July 31, 2002, RES sent six such notices to counsel for the employee. However, the employee did not complete employment applications, or attend any of the scheduled job interviews, for any of the positions. The record indicates that three of the positions for which the employee had been scheduled to interview have since been filled, while at least one remained open as of August 2002.
 "Vocational experts retained by both the employers and the employee testified at trial. Eddie Rice, the employers' vocational expert, testified that he had interviewed and evaluated the employee and that he had concluded after the employee's second FCE that the employee had suffered a vocational disability of 62% as a result of his injury; Rice also opined that the employee could perform the work required by each of the positions located by RES. Patsy Bramlett, the employee's vocational expert, also interviewed and evaluated the employee and concluded that the employee had suffered a 100% vocational disability, although she did not express an opinion concerning whether the positions located by RES were within the employee's capabilities.
 "As a general rule, permanent total disability is properly defined as `the inability to perform one's trade and the inability to find gainful employment.' TAJ-Rack Div., Inc. v. Harris, 603 So.2d 1061, 1064
(Ala.Civ.App. 1992) (citing Mead Paper Co. v. Brizendine, 575 So.2d 571 (Ala.Civ.App. 1990)). In Kirklewski, we addressed the so-called `odd lot' doctrine, `under which total disability may be found even where an employee is not totally incapacitated for work where that employee is so handicapped *Page 1070 
that he or she will not be employed regularly in any well-known branch of the labor market.' 893 So.2d at 441. With respect to the `inability to find gainful employment' prong of permanent total disability, we noted in Kirklewski that while a `limited or specialized' medical impairment may require an employee to demonstrate that suitable work is not available in order to demonstrate a permanent and total disability, a prima facie showing of `odd lot' status, via evidence of the degree of an `obvious' physical impairment and factors such as the employee's mental capacity, education, training, or age, may shift the burden of proving availability
of work to an employer. 893 So.2d at 441-42 (citing 4 Arthur Larson Lex K. Larson, Larson's Workers' Compensation Law § 84.01[3] and [4] (2003)).
 "Assuming, without deciding, that the employee in this case made a prima facie showing that he is permanently and totally disabled, § 25-5-57(a)(4)d. specifically precludes an employee from being deemed permanently and totally disabled in three instances: (a) when the employee refuses physical rehabilitation, (b) when the employee refuses vocational rehabilitation, and (c) when the employee refuses to accept a reasonable accommodation. In contrast to Kirklewski, which involved an employer's attempt to demonstrate that it had attempted to offer its employee work for that employer that `reasonably accommodated' her injured condition, the employers in this case have adduced evidence that they have attempted to find suitable employment for the employee with other hiring authorities. Whether the employer's evidence may properly defeat the employee's claim of permanent and total disability thus depends on our response to two questions, one legal and one factual: (1) whether a former employer's efforts to locate suitable employment on behalf of an injured employee fall within the scope of `vocational rehabilitation,' as that term is used in § 25-5-57(a)(4)d.; and (2) if question (1) is answered in the affirmative, whether the employee `refused' the rehabilitation services offered by the employers.
 "With respect to the first of those questions, we note that the trial court in this case concluded that the employers had not offered vocational rehabilitation in the manner `defined by' the Act, a curious conclusion because the term `vocational rehabilitation' is not specifically defined in the Act or generally defined anywhere in the Alabama Code. In light of the absence of any such specific definition, we `"look to the plain meaning of the words as written by the legislature."' Ex parte Shelby County Health Care Auth., 850 So.2d 332, 337
(Ala. 2002) (quoting DeKalb County LP Gas Co. v. Suburban Gas, Inc., 729 So.2d 270, 275 (Ala. 1998)).
 "The word `rehabilitation' is the noun form of the verb `rehabilitate,' which is defined as meaning `to restore to a former capacity' or `to restore to a former state.' Merriam-Webster's Collegiate Dictionary (11th ed. 2003). Similarly, `vocational' is the adjectival form of the word `vocation,' which refers to one's regular work. Id. at 1400. Thus, we would interpret `vocational rehabilitation,' as that term is used in § 25-5-57(a)(4)d., as referring to an employer's efforts to restore an employee to the status of holding regular gainful employment. See also Chancy Croft, Something More Important Than Money-Vocational Rehabilitation in Workers' Compensation Cases, 3 Alaska Law Rev. 49, 53-54 (1986) (noting that vocational rehabilitation in the workers'-compensation context aims to restore an industrially *Page 1071 
injured worker to a state of employability equal to, or as near as possible to, that of his or her preinjury status). Such efforts `typically include . . . job placement opportunities' (id.), and workers' compensation statutes in a number of states expressly recognize job placement as constituting a vocational-rehabilitation service. E.g., Okla. Stat. Ann. tit. 85, § 16A (West 1997); Mass. Gen. Laws Ann. ch. 152, § 1(12) (West 2004); Md. Code Ann., Lab. Empl. § 9-670(e)(2)(ix) (2003); see also 29 U.S.C. § 723(a)(4) (including `job search and placement assistance' within scope of `vocational rehabilitation services' to be provided by states to disabled individuals under the Rehabilitation Act of 1973).
 "We conclude that the legislature, in determining in § 25-5-57(a)(4)d. that `refus[al] to undergo . . . vocational rehabilitation' will disqualify an injured employee from being found permanently and totally disabled under the Act, intended to include within the scope of that provision all efforts to restore an industrially injured worker to employment, including the type of job-placement services procured by the employers in this case. The trial court therefore erred in interpreting § 25-5-57(a)(4)d. contrary to that legislative intent.
 "However, the second query remains: did the employee in this case `refuse' vocational rehabilitation in the form of job-placement services? While the employee testified that he had not been personally contacted with an interview request or a job offer, there is no dispute in the record that RES, acting on behalf of the employers, identified a number of positions that fell within the work restrictions placed upon the employee by Dr. Beck — positions that Dr. Beck himself personally approved — and informed the employee's attorney of six scheduled job interviews in an effort to match the employee to suitable positions. However, the employee's attorney barred RES from contacting the employee to provide him with information regarding those scheduled interviews, and the employee consequently never applied for or interviewed for any of those positions. The knowledge of the employee's attorney, which came to the attorney in the line and scope of his legal representation of the employee, is imputed to the employee. See Sanders v. Flournoy, 640 So.2d 933, 939 (Ala. 1994). The employee's undisputed failure to make a good-faith effort even to apply or interview for the positions located by RES that had been specifically identified as being within his residual employment capacity must, under any reasonable interpretation of § 25-5-57(a)(4)d., amount to a `refusal' of vocational-rehabilitation services offered by RES on the employer's behalf.
 "We conclude that the trial court's judgment awarding permanent-total-disability benefits under the Act to the employee is contrary to the law and the evidence. We reverse that judgment and remand for the trial court to determine (a) whether the employee has instead suffered a permanent partial disability under Ala. Code 1975, § 25-5-57(a)(3); (b) the extent of any such permanent partial disability; and (c) the amount and duration of any reduction of compensation mandated by the `refusal of suitable employment' provisions of § 25-5-57(a)(3)e., Ala. Code 1975. The employee's request for an award of attorney fees on appeal is denied on the authority of Statewide Painting Co. v. Sharron, 693 So.2d 518 (Ala.Civ.App. 1997), and Cowgill v. Bowman Transportation, Inc., 587 So.2d 1000 (Ala.Civ.App. 1991), cert. quashed, 587 So.2d 1002 (Ala. 1991). *Page 1072 
 "¹The employers have conceded that Skilstaf, Inc., was the employee's `general employer' and that Clear Creek Transportation, Inc., was the employee's `special employer.' See generally Terry v. Read Steel Prods., 430 So.2d 862, 865 (Ala. 1983).
 "²The employers have also challenged the sufficiency of the trial court's findings and conclusions under § 25-5-88, Ala. Code 1975; however, while the trial court does treat certain issues in a somewhat summary fashion in its five-page judgment, that court substantially complied with that statute so as to warrant our review on the merits. See Dees v. Daleville Florist, 408 So.2d 155, 156 (Ala.Civ.App. 1981) (`Substantial compliance with [§ 25-5-88] will suffice.').
 "³Butler testified that each potential opening located for a particular injured employee required between 90 and 100 telephone calls by RES personnel to prospective employers."
Because, as the foregoing demonstrates, I would reverse the trial court's judgment, I respectfully dissent.
CRAWLEY, J., concurs.