On November 12, 1997, Phenix Rental Center ("Phenix") filed a complaint in the Russell County Circuit Court for a judgment declaring whether Phenix's employee, Angel Ray Batiz, was entitled to workers' compensation benefits under the Alabama Workers' Compensation Act. Batiz had been diagnosed with hepatitis C ("hepatitis"), which he alleged was for him an occupational disease. Batiz filed a counterclaim seeking those benefits. After various filings by the parties, the trial court held an evidentiary hearing on August 26, 1999 ("the 1999 hearing"), following which the trial court found, among other things, that Batiz had "suffered a work related injury by contracting hepatitis" and ordered that Phenix provide him workers' compensation benefits. Subsequently, on April 2, 2001, the trial court held a second evidentiary hearing ("the 2001 hearing"), resulting in an order entered on April 24, 2001, declaring Batiz to be "totally and permanently disabled." Phenix appealed to the Alabama Court of Civil Appeals, and on June 28, 2002, that court affirmed the judgment of the trial court, without an opinion. See Phenix Rental Ctr. v. Batiz
(No. 2000846, June 28, 2002), 863 So.2d 1162 (Ala.Civ.App. 2002) (table). After its application for a rehearing was overruled, Phenix petitioned this Court for a writ of certiorari *Page 228 
to review the decision of the Court of Civil Appeals. We granted Phenix's petition on December 10, 2002, to address whether the Court of Civil Appeals' judgment affirming the trial court's holding that Batiz is totally and permanently disabled conflicted with previous decisions of that court.
The record shows that Phenix is in the equipment-rental business, which includes the rental of portable fiberglass toilets. Beginning in October 1995, Batiz was employed by Phenix as a laborer repairing various fiberglass rental items, including the toilets. Batiz testified at the 1999 hearing that the repair work often resulted in "cuts or splinters from the fiberglass" to, or into, his hands and sometimes required him to come in contact with human waste that had not been completely pumped from waste reservoirs in the toilets.[1]
As stated in Phenix's complaint, on August 12, 1997, Batiz reported that he had been diagnosed with hepatitis and he alleged that he contracted the disease through his employment at Phenix. After having been diagnosed on August 12, 1997, Batiz took a leave of absence from work at Phenix and did not return to work until October 1997. Upon his return to work, Batiz worked half days and full days depending on how he felt, and he has continued to do so, as stated in both Phenix's petition and in Batiz's brief to this Court.[2] Since his diagnosis, Batiz has been evaluated by Dr. Robert R. Brinson, an infectious-disease specialist, who was still treating Batiz for his disease at the time of the 2001 hearing, and by Dr. Glenn Bedsole, also an infectious-disease specialist; he has also been evaluated by Virginia Spruce and Jane Logan, both of whom are vocational consultants.
The trial court's 1999 order directing Phenix to pay Batiz workers' compensation benefits states, in pertinent part:
 "[These] parties and counsel appeared before this court for hearing on this cause on August 26, 1999. Sworn testimony was taken and the court considered evidence admitted. The court hereby makes a finding of fact as follows:
 "1.[Batiz] contracted hepatitis while an employee of [Phenix].
 "2. [Batiz's] employment at [Phenix] exposed him to hepatitis pathogens.
 "3. No reasonable explanation has been proffered as to how [Batiz] contracted hepatitis other than exposure resulting from his employment at [Phenix]. *Page 229 
"4. [Batiz] suffered vocational disability.
 "5. [Batiz] needs further medical evaluation and treatment in order to determine the extent of his disability.
"It is therefore,
"Ordered, Adjudged, and Decreed:
 "1. That [Batiz] suffered a work related injury by contracting hepatitis in August 1997.
 "2. [Phenix] is ordered to provide worker's compensation benefits for [Batiz] effective August 12, 1997.
 "3. [Batiz] is ordered to undergo further medical evaluation and treatment to be provided by [Phenix].
 "4. This matter is ordered continued for further hearing by motion of either party."
The trial court's 2001 order found that Batiz was totally and permanently disabled; that order states, in relevant part:
 "The parties and counsel appeared before the court for hearing in this cause on the 2nd day of April 2001. Sworn testimony was taken and the court considered the evidence admitted. Upon consideration of the same, it is hereby
"Ordered, Adjudged, and Decreed:
 "1. That the defendant, [Batiz], is declared to be totally and permanently disabled.
 "2. That [Phenix] is ordered to pay past medical and future medical expenses as provided by law.
 "3. That [Phenix] is ordered to pay [Batiz] past and future income benefits as provided by law.
"4. That notice shall issue to the parties."
In its petition, Phenix argues that the combined effect of these two orders was such that the trial court erred (1) in finding Batiz to be permanently and totally disabled; (2) in considering testimony about Batiz's vocational disability; and (3) in failing to make specific findings of fact and state conclusions of law.
Our standard of review in a workers' compensation case is that standard stated by this Court in Ex parte Trinity Industries, Inc., 680 So.2d 262,268-69 (Ala. 1996):
 "[W]e will not reverse the trial court's finding of fact if that finding is supported by substantial evidence — if that finding is supported by `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'"
(Quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870,871 (Ala. 1989).) Moreover, the Court of Civil Appeals observed inEdwards v. Jesse Stutts, Inc., 655 So.2d 1012, 1014 (Ala.Civ.App. 1995), that "the [1992 Workers' Compensation] Act did not alter the rule that this court does not weigh the evidence before the trial court." (Emphasis added.) Finally, Trinity Industries requires that we review the evidence in this workers' compensation action in a light most favorable to the appellee — in this case, Batiz. 680 So.2d at 270.
Phenix contends that the trial court erred by finding that Batiz was permanently and totally disabled. Within that argument, Phenix asserts the subargument that because Batiz had not reached maximum medical improvement ("MMI") as of the time of the 2001 order, he could not be deemed permanently disabled under Alabama law. A claimant has reached MMI when "there is no further medical care or treatment that could be reasonably anticipated to lessen the claimant's disability." G.UB.MK.Constructors v. Traffanstedt, 726 So.2d 704, 709 (Ala.Civ.App. 1998). "[M]aximum medical improvement is reached when the employee has recovered as much as medically possible from the wound such that the extent of permanent disability, if any, can be estimated." 1 Terry A. Moore,Alabama's Workers' Compensation § 13:5, p. 502 (1998) (footnotes omitted). "Maximum medical improvement does not mean complete cure or total recovery from the work-related injury." Id. "Permanent disability refers to the compensable disability remaining after the employee has reached maximum medical improvement." Id. at § 13:15, p. 514 (emphasis added; footnote omitted). In support of its argument, Phenix claims that the no-opinion affirmance by the Court of Civil Appeals conflicts with *Page 230 
that court's earlier decisions in Alabama By-ProductsCorp. v. Lolley, 506 So.2d 343 (Ala.Civ.App. 1987); Pemco Aeroplex, Inc.v. Johnson, 634 So.2d 1018 (Ala.Civ.App. 1994); Edward Wiggins LoggingCo. v. Wiggins, 603 So.2d 1094 (Ala.Civ.App. 1992); and Hillery v. MacMillanBloedel, Inc., 717 So.2d 824 (Ala.Civ.App. 1998).
In Alabama By-Products, supra, an employee had injured her left knee several times during the course of her employment. She ultimately underwent knee-replacement surgery and thereafter sought workers' compensation benefits. Litigation ensued. At the trial, conducted only five months after the surgery, the employee's orthopedic surgeon testified as to her condition. The surgeon testified that he had not yet determined the extent of the employee's disability, nor had he been able to establish a "disability percentage rating concerning the employee's knee." 506 So.2d at 344. He explained that it was his normal practice to wait approximately one year after such a surgical procedure before determining a patient's disability percentage rating. The surgeon further testified that the employee had not reached MMI. After the hearing, the trial court found the employee to be permanently and totally disabled and thus entitled to workers' compensation benefits consistent with that rating. The employer appealed, arguing that the trial court's finding that the employee was permanently and totally disabled "should have been deferred because maximum medical improvement had not been attained." 506 So.2d at 344. Reversing the trial court's judgment, the Court of Civil Appeals stated:
 "Here the evidence was that the amount of the employee's disability could not be determined at this time. It was [the surgeon's] testimony that it was too soon after the knee replacement surgery for him to make any disability rating or even to comment on the extent of the employee's disability. This testimony of [the surgeon] was not contradicted. Put another way, the evidence that the employee had not reached maximum medical improvement was not disputed.
 "In view of the above, the trial court waspremature in finding that the employee was permanently and totally disabled. Stated differently, there is no evidence at this time to support a finding of permanent and total disability."
506 So.2d at 344.
In Edward Wiggins Logging Co., supra, Edward Wiggins, an employee of Edward Wiggins Logging Company, and Overstreet McCorquodale, Inc., entered into a lump-sum settlement agreement with his employers to settle his claim for workers' compensation benefits arising from an injury to his left index finger. The agreement was presented for the trial court's approval on April 11, 1989, and the trial court entered a judgment that same day in the amount of $4,002.01, representing a 100% disability to Wiggins's left index finger. Just shy of two years later, Wiggins filed a motion to vacate the judgment, alleging, among other things, that he had not reached MMI until more than three months after the settlement date. The trial court set aside the judgment, and the employers appealed. Affirming the judgment of the trial court, the Court of Civil Appeals stated:
 "The trial court had before it the treating physician's progress notes reflecting that Wiggins reached maximum medical improvement as of July 27, 1989, more than three months after Wiggins entered into the settlement agreement, pro se. Our cases are clear that in order for the employee to recover permanent partial or permanent total disability benefits, the employee must *Page 231 have reached maximum medical improvement. Alabama By-Products Corp. v. Lolley, 506 So.2d 343 (Ala.Civ.App. 1987)."
603 So.2d at 1095 (emphasis supplied).
In Pemco, supra, Steven R. Johnson sought workers' compensation benefits from his employer Pemco Aeroplex, Inc. ("Pemco"), as a result of an alleged back injury he suffered in the course of his employment. At an ore tenus hearing, Johnson's chiropractor, who had been treating Johnson for approximately two and a half years following the injury, testified that he had placed permanent lifting restrictions on Johnson and that Johnson had reached MMI. Following that proceeding, the trial court found that Johnson had suffered a permanent partial disability and that he had suffered a 30% loss of earning capacity as a result of the injury. The trial court awarded workers' compensation benefits accordingly, and Pemco appealed. The Court of Civil Appeals affirmed the trial court's judgment finding that Johnson had reached MMI and had suffered a 30% loss of earning capacity; however, it reversed the trial court's judgment insofar as it allocated benefits for accrued temporary total disability, accrued permanent partial disability, and future permanent partial disability, because of a discrepancy in the computation of those benefits. The Court of Civil Appeals explained:
 "The trial court further found that Johnson had received all temporary total benefits to which he was entitled, indicating at first blush that the trial court intended to award permanent partial disability benefits. A finding that Johnson was entitled to 165 weeks of accrued permanent partial disability benefits, however, is inconsistent with the trial court's finding that Johnson reached maximum medical improvement in February 1992. It appears that the 165 weeks of accrued disability benefits encompassed the time period from August 1989 until October 1992. Part of this time was prior to Johnson reaching maximum medical improvement. In order for an employee to recover permanent disability benefits, he must have reached maximum medical improvement. Edward Wiggins Logging Co. v. Wiggins, 603 So.2d 1094 (Ala.Civ.App. 1992). The trial court's award of accrued permanent partial disability benefits is therefore inconsistent with its finding that Johnson reached maximum medical improvement in February 1992."
634 So.2d at 1021 (emphasis supplied).
Finally, in Hillery v. MacMillan Bloedel, Inc., supra, Bobby Edward Hillery, a log-truck driver employed by MacMillan Bloedel, Inc. ("MacMillan"), was injured while on the job in an accident involving another truck. Hillery had no visible signs of injury immediately after the accident, but he did not return to work, on the recommendation of a neurologist that he not drive until he had undergone a psychiatric evaluation. Shortly thereafter, MacMillan ceased its logging operations and laid off all of its truck drivers, including Hillery. Hillery then sued MacMillan for workers' compensation benefits. The trial court awarded Hillery temporary total disability benefits from February 4, 1993, the date of his injury, until March 12, 1993, the date he was laid off, and permanent partial disability benefits thereafter. Hillery appealed, asserting that nothing in the record established that he had reached MMI, and that, therefore, he was still entitled to receive temporary total disability benefits. Holding that the trial court had improperly determined that Hillery had reached MMI on a particular date, the Court of Civil Appeals stated, "[W]e cannot determine whether MMI was reached, or, if it *Page 232 
has been reached, when it was reached." 717 So.2d at 826. The court declared that "[b]efore a trial court can award permanent total or permanent partial disability benefits, the worker must havereached MMI. Alabama By-Products Corp. v. Lolley, 506 So.2d 343, 344
(Ala.Civ.App. 1987)." Id. at 825 (emphasis supplied). See also BostromSeating, Inc. v. Adderhold, [Ms. 2000878, December 6, 2002] 852 So.2d 784
(Ala.Civ.App. 2002).
Our review of the record supports Phenix's contention that Batiz had not reached MMI at the time of the trial court's 2001 order finding that he was permanently and totally disabled. In Batiz's response to Phenix's motion to preclude evidence of vocational disability filed on June 2, 1999, Batiz's attorney stated, "First, Mr. Batiz has not reached maximum medical improvement. He has not even begun to be treated for his permanent chronic illness." Then, at the 1999 hearing, Jane Logan, a vocational consultant, testified, in relevant part:
 "Q: Were you able to come up with a vocational disability rating for Mr. Batiz?
 "A: Well, basically, as I shared with you, this was a very difficult thing to do simply because there is [sic] a lot of factors here to take into consideration, one being that he has not had the treatment that has been recommended. Doctor Bedsole indicated in his deposition that he did need to go through or — excuse me — he did need to be seen by a doctor that regularly treats people with hepatitis, so as to be exposed to new medications that are out there for him. He has not gone through that and therefore it is almost like he really has not reached a point of maximum medical improvement or his condition hasn't stabilized to the point where we have a good idea of what his restrictions or physical capabilities are going to be in the future. . . ."
(Emphasis supplied.) In a deposition of Dr. Brinson, taken in August 2000, he was asked by counsel for Batiz this question, giving this response:
 "[Counsel for Batiz]: My last question would be where does he go from here? I know the judge is going to want to know. What is he supposed to be doing medically before he tries to make some kind of legal conclusion?
 "A: . . . Well, the thing that needs — if he has completed the six months of treatment, if he was able to take that despite the side effects, then he needs — we need to determine what his RNA titer is and what his — liver enzymes are now off treatment. And then if there's still a question of the amount of his symptoms that he's having, then maybe consider rebiopsying his liver to see if there's been any change. In other words, has the liver biopsy progressed or gotten worse despite treatment. Has it gotten better. Has it stayed the same. That would be the kind of thing to determine what to do next."
Shortly before the 2001 hearing, Dr. Brinson responded to a document that had been submitted to him six weeks earlier. That document, from Phenix's workers' compensation insurer, contained the question "[p]lease advise if [Batiz] has reached maximum medical improvement. . . . ___Yes ___No." Dr. Brinson placed a check mark next to the "no" option. That same document also contained the question "[i]f the patient has not reached MMI, what is the anticipated date?" to which Dr. Brinson responded "unknown." That information was provided to the trial court at the hearing. Also at that hearing, counsel for Batiz made the following statements during a colloquy among him, the court, and counsel for Phenix: *Page 233 
 "[Counsel for Phenix, Michael J. Cohan]: . . . While his hepatitis is stable, according to Dr. Brinson, he also says he is not at maximum medical improvement until this therapy, interferon therapy,[3] is completed.
 "[Counsel for Batiz]: The only thing — Mr. Cohan is correct. . . .
". . . .
 "[Mr. Cohan]: I have a vocational expert that is here, but to be quite candid, the vocational expert is virtually going to testify to what's contained in that caselaw that with him not reaching MMI that there's no way to assign a disability, and based on what we do have, assumes that MMI is zero.
 "The Court: Do you have anything in here that would refute that he's not at MMI?
"[Counsel for Batiz]: Your honor. I have a caselaw [sic] . . . .
". . . .
 "The Court: Of course, you're saying that he has not reached maximum medical improvement in that he has a permanent condition?
"[Counsel for Batiz]: He has a permanent restriction.
". . . .
 "[Counsel for Batiz]: . . . And we maintain that in the instance of Mr. Batiz having never been off of work, there's not an evaluation as to whether he has received maximum medical improvement or not."
Batiz has presented no evidence to contradict Phenix's contention that he had not reached MMI at the time the trial court ruled that he was permanently and totally disabled.
Finally, Batiz asserts in his brief to this Court that "[h]e has not reached maximum medical improvement, because he has an incurable disease." (Batiz's brief, p. 11.) In light of the Court of Civil Appeals' decisions in Alabama By-Products, Pemco, Edward Wiggins Logging Co., andHillery, and considering the lack of substantial evidence indicating that Batiz had reached MMI as of the time of the 2001 hearing, we conclude that the trial court erred in declaring him to be permanently and totally disabled. We hold, in agreement with Alabama By-Products, Pemco, EdwardWiggins Logging, and Hillery, that before a trial court can make a determination that an employee is permanently (and either partially or totally) disabled under the Alabama Workers' Compensation Act, the employee must have reached MMI. Batiz does not respond in any way to Phenix's argument concerning the rule of Alabama By-Products and the other cases cited above that an employee seeking compensation for eitherpermanent partial disability or permanent total disability (as opposed to either temporary total disability or temporary partial disability) must first have reached MMI. Batiz chooses instead to state dismissively, but without acknowledging any particular case, that Phenix "cites a series of cases of which many are not relevant to this issue before the Court. Furthermore, the cases cited by [Phenix] are not controlling and does [sic] not represent any kind of firm decision on the part of this Honorable Court" *Page 234 
(Batiz's brief, p. 3). Batiz states that his understanding is that Phenix "draws its argument pertaining to maximum medical improvement from Section 25-5-57(a)(3)[i.] where it basically states that when an injured employee returns back to work at an income level equal to or greater than the pre-injury wages, then no disability will be presumed to have been inflicted on the employee by that particular injury." (Batiz's brief, pp. 7-8.) That Code section provides, in pertinent part:
 "i. Return to Work. If, on or after the date of maximum medical improvement, except for scheduled injuries as provided in Section 25-5-57(a)(3), an injured worker returns to work at a wage equal to or greater than the worker's pre-injury wage, the worker's permanent partial disability rating shall be equal to his or her physical impairment and the court shall not consider any evidence of vocational disability. Notwithstanding the foregoing, if the employee has lost his or her employment under circumstances other than any of the following within a period of time not to exceed 300 weeks from the date of injury, an employee may petition a court within two years thereof for reconsideration of his or her permanent partial disability rating . . . ."
Batiz then undertakes to knock down that "straw man" argument by asserting that § 25-5-57(a)(3)i. does not apply in this case because, he argues, he "is not returning to work because he never left" (Batiz's brief, p. 11). He continues by arguing that "the fact that [he] continued to work because of necessity does not mean that his injury has not caused him to lose his ability to continue his trade" (Batiz's brief, p. 9). In the final analysis, Batiz simply takes the position that because his hepatitis is "incurable" his resulting disability must be permanent. The only portion of either hearing he cites in support of that contention is the testimony of vocational consultant Virginia Spruce, who, he says, testified that he was "totally and permanently disabled." Our review of the pages of the record Batiz cites for that testimony, which Ms. Spruce gave at the 1999 hearing, reveals that Ms. Spruce was careful to avoid expressing any opinion about Batiz's permanent level of disability, as reflected by the following segments of that testimony:
 "[Ms. Spruce]: No, at this time I feel he is 100 percent disabled.
". . . .
 "[Ms. Spruce]: . . . He needs to be evaluated so that we know what the future holds for this gentleman.
". . . .
 "[Mr. Cohan]: Again, you are assuming that his condition is going to be such that he needs this extensive treatment and that this is going to be debilitating in the future, when in fact you have testified you don't know; is that right?
 "[Ms. Spruce]: I think that you misunderstood me. Right now he is feeling that fatigue. He has some health problems right now. I don't know to what extent because he has not been evaluated and I am not a doctor.
". . . .
 "[Mr. Cohan]: When you were looking at Dr. Bedsole's deposition, do you recall him stating that there are people with chronic hepatitis who are incapacitated but there are a number of other people that continue to work?
"[Ms. Spruce]: Would you tell me what page you are on?
 "[Mr. Cohan]: Page 33 of his deposition, specifically line 17 — end of 17.
"[Ms. Spruce]: 17.
 "[Mr. Cohan]: It says, `There are people who have chronic hepatitis who are incapacitated *Page 235 
by it but there are [a] number of people that have chronic hepatitis who continue to work.'
 "[Ms. Spruce]: Right. And it says, `It depends on the severity of the hepatitis.'
 "[Mr. Cohan]: And we don't know what the severity of the hepatitis in Mr. Batiz is?
"[Ms. Spruce]: No, we do not.
 "[Mr. Cohan]: So we are assuming or you are assuming when you say that he is 100% disabled that this is going to be an incapacitating problem down the road?
 "[Ms. Spruce]: I am stating at this time that since he is unable to maintain substantial gainful activity working 40 hours a week at best and that this is a sheltered-type environment, if he had to go out in the workplace right now, I don't feel he would be employable. That does not mean that that is forever; but at this point in time I don't think he could go out on [sic] the employment market and find a job outside of employment with the insured and that appears to be a sheltered-type environment for him."
After all is said and done, the record is devoid of any evidence indicating that, as of the time the trial judge issued his April 24, 2001, order finding Batiz to be "totally and permanently disabled," Batiz had in fact reached MMI, as that status is defined by the law. That is not to say that, under the state of the record, the trial judge could not have attempted a determination of some sort of temporary disability rating. He acted prematurely, however, in making a determination of permanent disability.
The three cases cited by the Court of Civil Appeals in its no-opinion affirmance are Ex parte Trinity Industries, Inc., supra; BidermannIndustries Corp. v. Peterson, 655 So.2d 997 (Ala.Civ.App. 1994); andSumiton Timber Co. v. Anderson, 620 So.2d 54 (Ala.Civ.App. 1993). In the latter two cases and in Trinity Industries, Inc. v. Cunningham,680 So.2d 253 (Ala.Civ.App. 1995), which this Court affirmed in Ex parteTrinity Industries, Inc., the Court of Civil Appeals affirmed an award of compensation benefits based on a finding of permanent and total disability. In none of those cases was the issue whether the injured employee had reached MMI. Trinity dealt with the issue of "medical causation" in a situation where an employee "was rendered permanently and totally disabled as the result of a stroke suffered while at the workplace of his employer . . . ." Ex parte Trinity Indus., 680 So.2d at 265. In Bidermann, the trial judge found that the employee's "`doctors offer no cure or hope that her condition will substantially improve.'" 655 So.2d at 999. That finding was not challenged on appeal, the only issue in dispute being the cause of the employee's condition. The proof in Sumiton Timber included the testimony of a licensed professional counselor in vocational rehabilitation who testified that the employee was "totally and permanently disabled." 620 So.2d at 55 (emphasis supplied).
It was apparently the understanding of all concerned at the outset of the 2001 hearing that the only issues to be addressed were one or more unpaid medical bills and whether Batiz had reached MMI, as a precondition to any finding of permanent disability. That concept of the scope of the hearing was stated at the beginning of the hearing by counsel for Phenix, and he reiterated it several times during the course of the hearing, eliciting at least one confirmatory response from the trial judge. Because our reversal of the Court of Civil Appeals' judgment in this case is based on the absence of evidence from which the trial court could have made a determination of any degree of permanent disability, we recognize that a further evidentiary *Page 236 
proceeding will be required. For that reason, we pretermit consideration of Phenix's other claims of error relating to the trial court's finding of total disability even though Batiz had continued working for Phenix after his injury at allegedly the same or greater wage, thus invoking the limitations of §25-5-57(a)(3)i., set out above.
The judgment of the Court of Civil Appeals is reversed and the case remanded for the Court of Civil Appeals, in turn, to remand to the trial court for further proceedings consistent with our opinion.
REVERSED AND REMANDED.
Moore, C.J., and Houston, See, Lyons, Brown, Johnstone, and Stuart, JJ., concur.
[1] As a part its toilet-rental business, Phenix has trucks with large receiving tanks and a vacuum or pump that removes the waste contained in the waste reservoir of the toilets and pumps it into the tank on the truck.
[2] Batiz stated at the 1999 hearing that not all of the days he had taken off or had worked only a half day since his diagnosis were as a result of his illness, but rather some of those absences or partial work days had been used to take care of "personal business and stuff" and for vacations.
[3] In his deposition, Dr. Brinson stated that he had placed Batiz on a "combination Rebetron 1,000 milligrams and Interferon three million units three times a week." Dr. Brinson explained that such regimen is
 "an antiviral medication like you would use for other viral illnesses to try to reduce the viral replication in the liver. . . . Interferon has some properties that also reduce the amount of fibrosis. It's been shown the fibrosis in the liver is decreased as well with Interferon therapy in people with hepatitis C."