911 So.2d 1059 (2004)
CLEAR CREEK TRANSPORTATION, INC., and Skilstaf, Inc.
v.
Harold PEEBLES.
2020556.
Court of Civil Appeals of Alabama.
June 30, 2004.
Rehearing Denied December 30, 2004.
Certiorari Denied May 6, 2005.
Wallis S. Haynes, Birmingham, for appellants.
Thomas B. Denham, Moulton, for appellee.
Alabama Supreme Court 1040524.
*1060 MURDOCK, Judge.[1]
This case addresses the meaning of the term "rehabilitation" in § 25-5-57(a)(4)d, Ala.Code 1975, which states that "[a]ny employee whose disability results from an injury or impairment and who shall have refused to undergo physical or vocational rehabilitation or to accept reasonable accommodation shall not be deemed permanently and totally disabled." The trial court rejected the employers' argument that "rehabilitation," for purposes of that statute, may consist solely of a former employer locating one or more jobs that the former employer contends the employee is capable of performing. We too reject that argument, and, accordingly, we are compelled to affirm the trial court.
In February 2001, Harold Peebles ("the employee") filed an action against Clear Creek Transportation, Inc., and Skilstaf, Inc. ("the employers"),[2] seeking benefits under the Workers' Compensation Act, § 25-5-1 et seq., Ala.Code 1975, based upon an alleged work-related injury that had purportedly occurred in May 1999. After an ore tenus proceeding, the trial court entered a judgment in which it found that the employee had suffered a permanent and total disability. As part of its judgment, the trial court also made a finding that the employee had not refused "suitable employment" because he "ha[d] not been offered a job by any employer since" the date of his injury. Further, the trial court held that the employers had not offered vocational rehabilitation "in the manner as defined by the ... [Workers' Compensation] Act." We note further that the trial court found the employee to be "incapable of gainful employment and of earning a living" even if such vocational rehabilitation were to be offered. The employers appealed to this court.
"[T]he supreme court has consistently determined that the applicable standard of review does not allow this court to reweigh the evidence presented to the trial court." Mayfield Trucking Co. v. Napier, 724 So.2d 22, 25 (Ala.Civ.App.1998) (citing Ex parte Alabama Ins. Guar. Ass'n, 667 So.2d 97 (Ala.1995)).
The employers primarily argue on appeal that the employee's actions in this case were tantamount to a refusal of "suitable employment" and that this refusal was in turn tantamount to a refusal of "vocational rehabilitation" within the contemplation of § 25-5-57(a)(4)d.[3]
On May 24, 1999, the employee, who was 58 years old at the time, suffered an injury arising out of and in the course of his employment as a delivery-truck driver. Specifically, the employee slipped while inside a trailer, falling and injuring his neck, his right shoulder, and his rib cage. On the following day, he was diagnosed with a separation of the acromioclavicular joint and was prescribed analgesic medicine. In November 1999, after the employee had experienced severe pain in his neck, arms, and legs, Dr. Joel D. Pickett successfully *1061 operated on the employee to repair a cervical-disk herniation and to remove bone spurs apparently caused by the fall. Thereafter, the employee underwent physical therapy, as well as a functional-capacities evaluation ("FCE"). During the FCE, the employee reported experiencing severe pain, although he later reported not having problems completing the FCE. Moreover, the employee was described by the evaluating therapist as not having expended consistent effort during the FCE. In mid-April 2000, Dr. Eric Beck, the employee's treating physician, assigned the employee a 15% physical-impairment rating and concluded that the employee had reached maximum medical improvement ("MMI").
Although the employee was released to return to work in April 2000, he did not return to work for the employers because, he said, he had been terminated from their employment. The employee also did not seek or accept any other work. The employee consulted Dr. Cyrus Ghavam, an orthopedic surgeon, in June 2000; Dr. Ghavam diagnosed the employee as suffering from cervical stenosis. Dr. Ghavam recommended further surgery. The employee was subsequently found to be disabled by the federal Social Security Administration. Thereafter, in October 2000, the employee underwent a second surgery performed by Dr. Pickett, a cervical microlanotomy. After the second surgery, Dr. Pickett noted that the employee would reach MMI on January 13, 2001, that the employee could resume his normal activities as of that date, and that the employee had suffered a permanent physical impairment of 11%.
Despite the foregoing, the employee continued to complain of chronic neck pain and parasthesias (i.e., episodes of tingling) in his extremities. Dr. Pickett referred the employee back to Dr. Beck for reevaluation; based upon electrodiagnostic testing, Dr. Beck found no evidence of a pinched nerve and again assigned the employee a 15% permanent-physical-impairment rating. However, the employee continued to complain of neck pain and limitations in his ability to move his neck laterally or upward.
After litigation had arisen between the employee and the employers, Dr. Beck requested that the employee undergo a second FCE in June 2002. In his report of that FCE, Dr. Beck indicated that the employee's "Spurling's test" was negative bilaterally, which indicated no ongoing neural compression. The employee declined to complete a "modified step test" because he reported having heard a popping sound in his neck. Dr. Beck, however, reported that the employee exhibited equivocal effort. Based upon the second FCE, Dr. Beck opined that the employee should have no restrictions on sitting, standing, walking, squatting, or balancing; however, Dr. Beck limited the employee to occasionally lifting up to 15 pounds and frequently lifting up to 10 pounds, somewhat lighter lifting limitations than Dr. Beck considered to be within the employee's capacities in April 2001.
In the spring of 2002, Skilstaf's workers' compensation insurance carrier retained the services of Re-Employment Services, Ltd. ("RES"). RES claims to specialize "in matching [an] injured worker's physical capabilities to job opportunities." RES conducted a labor-market survey in the geographic area located within a 30-mile radius of the employee's home in an effort to locate specific, unfilled jobs that the employee would be purportedly capable of performing in his injured state. The founder of RES, Gordon R. Butler, testified that each potential opening located for a given injured employee required between 90 and 100 telephone calls by RES personnel to prospective employers.
*1062 As a result of the above-described efforts by RES personnel, a number of open positions were located that, according to Butler, the prospective employers had indicated the employee would be capable of performing the work involved. Those reported openings involved work as an insurance salesman, a telephone operator, an automobile salesman, a telephone solicitor, a financial-institution manager, an account-collection clerk, and a machine operator.
After conducting its initial survey, RES provided to Dr. Beck forms, requesting that he complete the forms and indicate his opinion as to whether the employee could perform the tasks required in each of the positions it had located. After the second FCE had been conducted, Dr. Beck completed the forms provided to him by RES; in completing those forms, he indicated that each of the positions was appropriate for the employee, so long as the employee did not have to lift more than 15 pounds. Dr. Beck later indicated that five out of six other positions located by RES (including positions as a recreation-facility attendant, a security guard (two positions), a retail-sales representative, and a customer-service representative) were, in his opinion, within the employee's capabilities.
On July 9, 2002, after RES had conducted both its initial and supplemental job-market surveys, RES for the first time sent a letter via facsimile to the attorney representing the employee requesting permission to interview the employee to determine "not only his wants and desires but his educational level, work experience, military service," and other employment-related factors. Counsel for the employee denied RES permission to contact the employee; the employee testified that he did not personally receive notice of RES's job-search efforts.
Thereafter, notwithstanding the response by counsel for the employee to RES's initial request for information, RES began scheduling job interviews for the employee. Between July 12 and July 31, 2002, RES sent six notices to counsel for the employee notifying him that it had arranged these job interviews. The employee did not complete employment applications or attend any of the job interviews reportedly scheduled for him by RES.
Both the employers and the employee retained vocational experts who testified at trial. The employers' vocational expert, Eddie Rice, testified that he had interviewed and evaluated the employee and had concluded that the employee suffered a vocational disability of 62% as a result of his injury. Rice also opined that the employee could perform the work required by each of the positions located by RES. The employee's vocational expert, Patsy Bramlett, also interviewed and evaluated the employee. She concluded, however, that the employee had suffered a 100% vocational disability.
In addition to the evidence provided by the vocational experts, the employee testified that he is a high-school graduate, that he has not attended vocational school or college, and that his "primary vocational history" for the last 30 years was that of a truck driver. The employee also testified at trial that he did not think he was able to drive a truck:
"Q. [By employee's counsel]. Do you think you are able to drive a truck at this time?
"A. No, sir.
"Q. Why is that?
"A. . . . I can't ride for very long periods of time, plus when you go into a dock to deliver you have to back in and I'm not able to turn sideways in a truck to get out to safely park a truck.
"Q. Why is that?

*1063 "A. Takes too much movement turning around in the seat being able to reach the clutch and brake.
"Q. Does it involve rotation of your neck?
"A. Yes, sir.
"....
"Q. What other reasons do you believe that you are not able to drive a truck if there is another reason?
"A. I can't sit for long periods of time and drive because I go to getting headaches and my eyes I get to where I can't really focus on the road. . . ."
The employee also testified that he did not know of any type of gainful work he could perform.
At trial, the employee testified that he constantly experiences pain and that the pain has increased since his second surgery. He also testified that takes pain medication every four to six hours and that his dosage of pain medication has continued to increase since his surgeries. The employee also testified that "physically and mentally [he] get[s] real short with people," that he is not able to sit for long periods, that he has no appetite because of the pain medication he takes, and that he is not able to get out and do the things he enjoys doing. He further stated that when he sleeps his arms go to sleep and his neck still "bother[s][him] real bad and [he has] to get up" and walk around. The employee further testified that he was experiencing pain during the trial and that his pain was "constant."
"[I]t is well established that the trial court is in the best position to observe the demeanor and credibility of the employee and other witnesses in a workers' compensation case." Mayfield Trucking Co., 724 So.2d at 25. "The resolution of conflicting evidence is within the exclusive province of the trial court, and this court is forbidden to invade that province upon review." Id. "Further, it is well established that the trial court is in the best position to observe the demeanor and credibility of the employee and other witnesses in a workers' compensation case. Ex parte Alabama Ins. Guar. Ass'n, 667 So.2d [97] at 101 [(Ala.1995)]." Mayfield Trucking Co., 724 So.2d at 24. However, our review of a case involving a purely legal issue is without a presumption of correctness. See § 25-5-81(e)(1), Ala. Code 1975; McGhee v. International Paper Co., 729 So.2d 880, 881 (Ala.Civ.App. 1999).
Two subsections of § 25-5-57(a), Ala. Code 1975, are at issue in this case: subsection (3), which the Legislature has entitled "Permanent Partial Disability," and subsection (4), which the Legislature has entitled "Permanent Total Disability." Consistent with its title, subsection (3) addresses the issue of compensation for employees who suffer from a permanent partial disability, and, consistent with this stated scope, it contains a paragraph that is entitled, and that addresses, the "Effect of Refusal of Suitable Employment" by such an employee. § 25-5-57(a)(3)e. Likewise, consistent with its title, subsection (4) addresses the issue of compensation for employees who are permanently totally disabled; it contains a provision that addresses the consequences of such an employee's refusal to undergo physical or vocational rehabilitation (or to accept a reasonable workplace accommodation).
Paragraph e. of subsection (3) of § 25-5-57(a) reads in its entirety:
"Effect of Refusal of Suitable Employment. If an injured employee refuses employment suitable to his or her capacity offered to or procured for him or her, he or she shall not be entitled to any compensation at any time during the continuance of the refusal, unless at any *1064 time, in the opinion of the judge of the circuit court of the county of his or her residence, the refusal is justifiable."
(Emphasis added.) We conclude that this provision applies not to employees who are totally disabled, but only to those who suffer from a permanent partial disability.
As already noted, § 25-5-57(a)(3)e. is found within a subsection of the statute that our Legislature entitled "Permanent Partial Disability." More significantly, the wording of § 25-5-57(a)(3)e. makes it clear that that statute does not apply to employees who are totally disabled. Instead, as worded, § 25-5-57(a)(3)e. presumes that the employee governed by its provisions has been determined to be partially disabled. Specifically, the statute presumes that an employee to whom it is applicable has been determined to have the "capacity" to work in some "suitable employment." For an employee who has been determined to be totally disabled, no job offered could be considered "suitable employment." See § 25-5-57(a)(4)d., Ala. Code 1975 (defining "permanent total disability" as an injury or impairment that "permanently and totally incapacitates the employee from working at and being retrained for gainful employment").
As noted above, § 25-5-57(a)(4) addresses the issue of compensation for employees who suffer from "permanent total disability." Quite logically, therefore, the Legislature has not included in § 25-5-57(a)(4) any provision comparable to paragraph e. of § 25-5-57(a)(3). A provision requiring employees to accept "suitable employment" would have no room for operation as to employees that have been determined to be totally disabled and, therefore, for whom there is no "suitable employment." See TAJ-Rack Div., Inc. v. Harris, 603 So.2d 1061, 1064 (Ala.Civ.App.1992)(noting that permanent total disability is properly defined as "the inability to perform one's trade and the inability to find gainful employment").
Moreover, workers' compensation law in Alabama is a creature of statute. See Slagle v. Reynolds Metals Co., 344 So.2d 1216 (Ala.1977). Unlike § 25-5-57(a)(3), § 25-5-57(a)(4) simply does not include an exception to an employee's entitlement to total-disability benefits based upon the receipt and refusal of a job offer.
What the Legislature did include in § 25-5-57(a)(4), however, is a provision that, as worded, is uniquely applicable to employees who, but for the ability to be retrained (or to be specially accommodated by their employer) would be totally disabled. The last sentence of § 25-5-57(a)(4)d. states: "Any employee whose disability results from an injury or impairment and who shall have refused to undergo physical or vocational rehabilitation or to accept reasonable accommodation shall not be deemed permanently and totally disabled." This provision obviously was meant to apply to employees who, after having reached MMI, see Ex parte Phenix Rental Center, 873 So.2d 226 (Ala.2003), are incapable of engaging in gainful employment before undergoing any physical or vocational rehabilitation but who would have some degree of capacity to engage in gainful employment if they were to undergo physical or vocational rehabilitation. Pursuant to § 25-5-57(a)(4)d., such an employee may not attempt to keep himself or herself in a position to continue receiving total-disability benefits by simply refusing to undergo rehabilitation that would increase his or her capacity to work to a point that he or she would no longer be totally incapacitated from working at gainful employment.
The last sentence of paragraph d. of § 25-5-57(a)(4) clearly applies only to those employees who are totally disabled. First, as noted, it is in that section of *1065 the statute entitled by the Legislature "Permanent Total Disability." More significantly, the language used by the Legislature makes it clear that this sentence applies to totally disabled employees. Finally, the sanction imposed by this provision for an employee's refusal to undergo rehabilitation is the disqualification of the employee from receiving total-disability benefits. If the employee were not totally disabled in the first instance (that is, in the absence of rehabilitation) the only sanction levied by the statute would be no sanction at all.
Thus, while subsections (3) and (4) of § 25-5-57(a) contain limiting provisions that create exceptions to an employee's entitlement to compensation benefits, those limitations are uniquely applicable to the respective sections in which the Legislature has placed them.
As noted, the employers argue that the employee's rejection of jobs they contend the employee could perform constituted a refusal of "rehabilitation." "Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning," however. IMED Corp. v. Systems Eng'g Assocs. Corp., 602 So.2d 344, 346 (Ala.1992). Merely locating jobs that purportedly correspond with an employee's post-MMI work capacity simply does not increase that work capacity. (Instead, evidence that there are jobs available that could be performed by the employee would go to the threshold issue of whether the employee was, in actuality, totally disabled in the first place.)
In the present case, the trial court found that the employee could not perform the jobs located by his former employers (even if the employee had been offered them) and that the employee therefore was totally disabled. The fact that the record before us contains evidence, introduced by the employers, that certain jobs were available and that the employee was capable of performing those jobs might be used to argue that the trial court's factual finding that the employee was totally disabled was contrary to the evidence. The employers do not rely upon that evidence for that purpose, however. That is, the employers do not argue on appeal that the trial court's factual finding that the employee was totally disabled was not supported by substantial evidence or was contrary to the great weight of the evidence; therefore, such factual issues are not before us.
Instead, the employers rely upon the evidence of various job openings to make a purely legal argument. The employers argue that the failure of the employee to cooperate with the employers' efforts to arrange interviews for those jobs (a) was equivalent, for purposes of the statute, to refusing actual job offers and (b) that those "refusals" prevented the trial court, as a matter of law, from finding the employee totally disabled. Even assuming for the sake of argument the validity of the proposition in (a), merely because a former employer has been able to locate another employer who is willing to interview the employee for a prospective job does not mean, and cannot mean, that as a matter of law the employee is capable of performing that job. To so hold would deprive the trial court of its statutorily prescribed role as the arbiter in workers' compensation cases. It would preempt the trial court from making findings that the employee is not capable of performing the job that is the subject of the prospective job interview (i.e., that the employee's refusal to attend that job interview is justified). It would tend to make the arranging of a job interview for an employee tantamount to a determination that the employee is capable of performing the job in question.
*1066 In sum, the employers do not challenge the sufficiency or the weight of the evidence as it relates to the trial court's factual finding that the employee was incapable of performing the jobs at issue. The purely legal argument that the employers make instead is not in accord with the statutory scheme plainly prescribed by our Legislature. While an employer's locating a job for a disabled employee might be helpful in returning to the workforce an employee who is otherwise capable of and engaged in physical or vocational rehabilitation, the location of a potential job, standing alone, does not as a matter of law constitute "rehabilitation" of an employee found by a trial court to be totally disabled.
On the basis of the foregoing, we must affirm the trial court's judgment.
The appellee's request for the award of an attorney fee on appeal is denied.
AFFIRMED.
YATES, P.J., and THOMPSON, J., concur.
PITTMAN, J., dissents, with writing, which CRAWLEY, J., joins.
PITTMAN, Judge, dissenting.
Like the late Justice Richard Jones in Insurance Co. of North America v. Citizensbank of Thomasville, 491 So.2d 880, 886 (Ala.1986) (Jones, J., concurring in part and dissenting in part), "I prepared ... a proposed opinion dealing with [a] case as I thought it should be dealt with," but in this case, like Justice Jones in Citizensbank, I lost. Following his example, I "now set out that rejected opinion as a full expression of my views on the issues here presented." Id.
"Under the Alabama Workers' Compensation Act (`the Act'), Ala.Code 1975, § 25-5-1 et seq., `[a]ny employee whose disability results from an injury or impairment and who shall have refused to undergo physical or vocational rehabilitation or to accept reasonable accommodation shall not be deemed permanently and totally disabled.' Ala.Code 1975, § 25-5-57(a)(4)d. This appeal involves the scope and effect of that provision of the Act.
"In February 2001, Harold Peebles (`the employee') filed a civil action in the Walker Circuit Court against Clear Creek Transportation, Inc., and Skilstaf, Inc. (`the employers'),1 seeking benefits under the Act based upon an alleged work-related injury that had purportedly occurred in May 1999. The cause was transferred to the Lawrence Circuit Court (`the trial court') in May 2001, after which the employers answered the complaint. After an ore tenus proceeding, the trial court entered a judgment in which it determined that the employee had suffered a permanent and total disability. As a component of its judgment, the trial court concluded that the employee had not refused `suitable employment' because he `ha[d] not been offered a job by any employer since' the date of his injury, that the employers had not offered vocational rehabilitation `in a manner as defined by the ... Act,' and that the employee was `incapable of gainful employment and earning a living' even if such vocational rehabilitation were to be offered. The employers moved for a new trial or, in the alternative, to alter, amend, or vacate the judgment, contending, among other things, that the trial court had erred in concluding that the employee was permanently and totally disabled; the trial court denied that motion in pertinent part. The employers appeal.
"This court will not reverse a judgment based on the factual findings of the trial court in a workers' compensation case if those findings are supported by *1067 `substantial evidence.' Ala.Code 1975, § 25-5-81(e)(2). `Substantial evidence' is `"evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved."' Ex parte Trinity Indus., Inc., 680 So.2d 262, 268 (Ala.1996) (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)). Pursuant to that principle of review, `"the trial court's findings on disputed evidence in a workers' compensation case are conclusive,"' and this court must not `"weigh the evidence before the trial court."' Ex parte Golden Poultry Co., 772 So.2d 1175, 1176 (Ala. 2000) (quoting Ex parte Ellenburg, 627 So.2d 398, 399 (Ala.1993), and Edwards v. Jesse Stutts, Inc., 655 So.2d 1012, 1014 (Ala.Civ.App.1995)). In contrast, our review as to purely legal issues is without a presumption of correctness. See Holy Family Catholic School v. Boley, 847 So.2d 371, 374 (Ala.Civ.App. 2002), and Ala.Code 1975, § 25-5-81(e)(1).
"The employers' principal substantive objection2 to the trial court's judgment concerns its award of permanent and total disability benefits under the Act based upon a conclusion that the employee did not refuse suitable employment or vocational rehabilitation. The employers cite § 25-5-57(a)(3)e., Ala. Code 1975, for the proposition that an injured employee is not entitled to compensation under the Act if he or she unjustifiably `refuses employment suitable to his or her capacity offered to or procured for him or her.' As a technical matter, the subsection cited by the employers pertains to permanent partial disability benefits, not to awards based upon permanent and total disability. However, as we recently noted in Fort James Operating Co. v. Kirklewski, 893 So.2d 434, 441 (Ala.Civ.App.2004), that portion of § 25-5-57(a)(4)d. that `prevents a finding of permanent and total disability where an employee has refused to undergo physical or vocational rehabilitation or to accept "reasonable accommodation"' is `analogous to § 25-5-57(a)(3)e.' in the context of a claimed permanent and total disability. Thus, we must consider whether, in light of the evidence presented by the parties, the trial court's determination of permanent and total disability is consistent with § 25-5-57(a)(4)d.
"The record reveals that on May 24, 1999, the employee, who was 58 years old at the time, was working as a delivery-truck driver in the line and scope of his employment by the employers when he slipped inside a trailer, fell, and injured his neck, his right shoulder, and his rib cage. Although the employee completed his work duties and drove himself home that day, he reported to a hospital on the following day, where he was diagnosed with a separation of the acromioclavicular joint and was prescribed analgesic medicine. In November 1999, after experiencing severe pain in his neck, arms, and legs, Dr. Joel D. Pickett successfully operated on the employee to repair a cervical-disk herniation and to remove bone spurs apparently caused by his fall; the employee then underwent physical therapy and a functional-capacities evaluation (`FCE') in early 2000. During the FCE, the employee reported experiencing severe pain, although he later reported not having problems completing the FCE. Moreover, the employee was described by the evaluating therapist as not having expended consistent effort during the FCE, a fact that the employee's treating physician, Dr. Eric Beck, noted as an `indicator of symptom magnification.' In *1068 mid-April 2000, Dr. Beck assigned the employee a 15% physical-impairment rating and opined that the employee had reached maximum medical improvement ("MMI"); Dr. Beck placed no work restrictions on the employee's sitting, standing, walking, fingering, pinching, or gripping, and indicated that the employee could perform jobs requiring him occasionally to lift 30 pounds and frequently to lift 15 pounds.
"Although the employee was released to return to work in April 2000, he did not return to work for the employers because, he said, he had been terminated from their employment because he had `had too many insurance claims'; the employee did not seek out or accept any other work. The employee consulted Dr. Cyrus Ghavam, an orthopedic surgeon, in June 2000; Dr. Ghavam diagnosed the employee as having cervical stenosis and recommended further surgery. In October 2000, after the employee had been found disabled by the federal Social Security Administration, the employee underwent a second surgery performed by Dr. Pickett, a cervical microlanotomy, in an effort to remove bone matter in the area of his cervical nerves. After that surgery, Dr. Pickett indicated that the employee would reach MMI on January 13, 2001, that he could resume his normal activities as of that date, and that the employee had suffered a permanent physical impairment of 11%.
"Despite these medical procedures, the employee continued to complain of chronic neck pain and parasthesias (i.e., episodes of tingling) in all four of his bodily extremities. Dr. Pickett referred the employee back to Dr. Beck for reevaluation; after electrodiagnostic testing, Dr. Beck found no evidence of a pinched nerve and again assigned the employee a 15% permanent-impairment rating. However, the employee continued to complain of neck pain and limitations in his ability to move his neck laterally or upward.
"After litigation had arisen between the employee and the employers, Dr. Beck requested that the employee undergo a second FCE in June 2002. In his report of that FCE, which Dr. Beck himself conducted, Dr. Beck indicated that the employee's `Spurling's test' was negative bilaterally, which indicated no ongoing neural compression. Moreover, the employee again exhibited equivocal effort, and he declined to complete a modified step test because he reported having heard a popping sound in his neck. After the second FCE, Dr. Beck opined that the employee should have absolutely no restrictions on sitting, standing, walking, squatting, or balancing; however, the employee was also determined to be able to occasionally lift up to 15 pounds and to be able to frequently lift up to 10 pounds, which were somewhat lighter weights than Dr. Beck considered within the employee's capacities in April 2001.
"In the spring of 2002, Skilstaf's workers' compensation insurance carrier retained the services of Re-Employment Services (`RES'), a company founded in 1995 by Gordon R. Butler that claims to specialize `in matching [an] injured worker's physical capabilities to job opportunities.' RES conducted a labor-market survey of the geographic area located within a 30-mile radius of the employee's home to locate specific unfilled jobs3 that the employee would be capable of performing in his injured state. RES located eight open positions as to which the pertinent hiring authorities indicated that the employee would be capable of performing the work involved; those positions involved work as *1069 an insurance salesperson, a telephone operator (two openings), an automobile salesperson (two openings), a telephone solicitor, a financial-institution manager, and a check-collection clerk.
"After conducting its initial survey, RES contacted Dr. Beck and requested that he review the survey and opine whether the employee could perform the tasks required in each of the positions located. Dr. Beck deferred responding to RES until after the second FCE had been conducted, whereupon Dr. Beck indicated that each of the positions was appropriate for the employee so long as the employee did not have to lift more than 15 pounds. Dr. Beck later approved five of six other positions located by RES, including positions as a recreation attendant, a security guard (two positions), a retail-sales representative, a customer-service representative, and a dump-truck driver, as being within the employee's capabilities. Butler described the positions that RES had located for the employee as being `semi-skilled' with the availability of on-the-job training.
"On July 9, 2002, RES sent a letter via facsimile to the attorney representing the employee in this action indicating that RES was in the process of finding employment opportunities for the employee; in that letter, RES requested permission to interview the employee to determine `not only his wants and desires but his educational level, work experience, military service,' and other employment-related factors. Counsel for the employee denied RES permission to contact the employee, and the employee testified at trial that he had personally received no notice of RES's job-search efforts.
"RES then began sending notices to the employee's counsel addressed to the employee notifying him of various job interviews that RES had scheduled with the six prospective employers it had most recently contacted; between July 12 and July 31, 2002, RES sent six such notices to counsel for the employee. However, the employee did not complete employment applications, or attend any of the scheduled job interviews, for any of the positions. The record indicates that three of the positions for which the employee had been scheduled to interview have since been filled, while at least one remained open as of August 2002.
"Vocational experts retained by both the employers and the employee testified at trial. Eddie Rice, the employers' vocational expert, testified that he had interviewed and evaluated the employee and that he had concluded after the employee's second FCE that the employee had suffered a vocational disability of 62% as a result of his injury; Rice also opined that the employee could perform the work required by each of the positions located by RES. Patsy Bramlett, the employee's vocational expert, also interviewed and evaluated the employee and concluded that the employee had suffered a 100% vocational disability, although she did not express an opinion concerning whether the positions located by RES were within the employee's capabilities.
"As a general rule, permanent total disability is properly defined as `the inability to perform one's trade and the inability to find gainful employment.' TAJ-Rack Div., Inc. v. Harris, 603 So.2d 1061, 1064 (Ala.Civ.App.1992) (citing Mead Paper Co. v. Brizendine, 575 So.2d 571 (Ala.Civ.App.1990)). In Kirklewski, we addressed the so-called `odd lot' doctrine, `under which total disability may be found even where an employee is not totally incapacitated for work where that employee is so handicapped *1070 that he or she will not be employed regularly in any well-known branch of the labor market.' 893 So.2d at 441. With respect to the `inability to find gainful employment' prong of permanent total disability, we noted in Kirklewski that while a `limited or specialized' medical impairment may require an employee to demonstrate that suitable work is not available in order to demonstrate a permanent and total disability, a prima facie showing of `odd lot' status, via evidence of the degree of an `obvious' physical impairment and factors such as the employee's mental capacity, education, training, or age, may shift the burden of proving availability of work to an employer. 893 So.2d at 441-42 (citing 4 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 84.01[3] and [4] (2003)).
"Assuming, without deciding, that the employee in this case made a prima facie showing that he is permanently and totally disabled, § 25-5-57(a)(4)d. specifically precludes an employee from being deemed permanently and totally disabled in three instances: (a) when the employee refuses physical rehabilitation, (b) when the employee refuses vocational rehabilitation, and (c) when the employee refuses to accept a reasonable accommodation. In contrast to Kirklewski, which involved an employer's attempt to demonstrate that it had attempted to offer its employee work for that employer that `reasonably accommodated' her injured condition, the employers in this case have adduced evidence that they have attempted to find suitable employment for the employee with other hiring authorities. Whether the employer's evidence may properly defeat the employee's claim of permanent and total disability thus depends on our response to two questions, one legal and one factual: (1) whether a former employer's efforts to locate suitable employment on behalf of an injured employee fall within the scope of `vocational rehabilitation,' as that term is used in § 25-5-57(a)(4)d.; and (2) if question (1) is answered in the affirmative, whether the employee `refused' the rehabilitation services offered by the employers.
"With respect to the first of those questions, we note that the trial court in this case concluded that the employers had not offered vocational rehabilitation in the manner `defined by' the Act, a curious conclusion because the term `vocational rehabilitation' is not specifically defined in the Act or generally defined anywhere in the Alabama Code. In light of the absence of any such specific definition, we `"look[] to the plain meaning of the words as written by the legislature."' Ex parte Shelby County Health Care Auth., 850 So.2d 332, 337 (Ala. 2002) (quoting DeKalb County LP Gas Co. v. Suburban Gas, Inc., 729 So.2d 270, 275 (Ala.1998)).
"The word `rehabilitation' is the noun form of the verb `rehabilitate,' which is defined as meaning `to restore to a former capacity' or `to restore to a former state.' Merriam-Webster's Collegiate Dictionary (11th ed.2003). Similarly, `vocational' is the adjectival form of the word `vocation,' which refers to one's regular work. Id. at 1400. Thus, we would interpret `vocational rehabilitation,' as that term is used in § 25-5-57(a)(4)d., as referring to an employer's efforts to restore an employee to the status of holding regular gainful employment. See also Chancy Croft, Something More Important Than Money-Vocational Rehabilitation in Workers' Compensation Cases, 3 Alaska Law Rev. 49, 53-54 (1986) (noting that vocational rehabilitation in the workers'-compensation context aims to restore an industrially *1071 injured worker to a state of employability equal to, or as near as possible to, that of his or her preinjury status). Such efforts `typically include ... job placement opportunities' (id.), and workers' compensation statutes in a number of states expressly recognize job placement as constituting a vocational-rehabilitation service. E.g., Okla. Stat. Ann. tit. 85, § 16A (West 1997); Mass. Gen. Laws Ann. ch. 152, § 1(12) (West 2004); Md.Code Ann., Lab. & Empl. § 9-670(e)(2)(ix) (2003); see also 29 U.S.C. § 723(a)(4) (including `job search and placement assistance' within scope of `vocational rehabilitation services' to be provided by states to disabled individuals under the Rehabilitation Act of 1973).
"We conclude that the legislature, in determining in § 25-5-57(a)(4)d. that `refus[al] to undergo ... vocational rehabilitation' will disqualify an injured employee from being found permanently and totally disabled under the Act, intended to include within the scope of that provision all efforts to restore an industrially injured worker to employment, including the type of job-placement services procured by the employers in this case. The trial court therefore erred in interpreting § 25-5-57(a)(4)d. contrary to that legislative intent.
"However, the second query remains: did the employee in this case `refuse' vocational rehabilitation in the form of job-placement services? While the employee testified that he had not been personally contacted with an interview request or a job offer, there is no dispute in the record that RES, acting on behalf of the employers, identified a number of positions that fell within the work restrictions placed upon the employee by Dr. Beck  positions that Dr. Beck himself personally approved  and informed the employee's attorney of six scheduled job interviews in an effort to match the employee to suitable positions. However, the employee's attorney barred RES from contacting the employee to provide him with information regarding those scheduled interviews, and the employee consequently never applied for or interviewed for any of those positions. The knowledge of the employee's attorney, which came to the attorney in the line and scope of his legal representation of the employee, is imputed to the employee. See Sanders v. Flournoy, 640 So.2d 933, 939 (Ala. 1994). The employee's undisputed failure to make a good-faith effort even to apply or interview for the positions located by RES that had been specifically identified as being within his residual employment capacity must, under any reasonable interpretation of § 25-5-57(a)(4)d., amount to a `refusal' of vocational-rehabilitation services offered by RES on the employer's behalf.
"We conclude that the trial court's judgment awarding permanent-total-disability benefits under the Act to the employee is contrary to the law and the evidence. We reverse that judgment and remand for the trial court to determine (a) whether the employee has instead suffered a permanent partial disability under Ala.Code 1975, § 25-5-57(a)(3); (b) the extent of any such permanent partial disability; and (c) the amount and duration of any reduction of compensation mandated by the `refusal of suitable employment' provisions of § 25-5-57(a)(3)e., Ala.Code 1975. The employee's request for an award of attorney fees on appeal is denied on the authority of Statewide Painting Co. v. Sharron, 693 So.2d 518 (Ala.Civ.App. 1997), and Cowgill v. Bowman Transportation, Inc., 587 So.2d 1000 (Ala.Civ. App.1991), cert. quashed, 587 So.2d 1002 (Ala.1991).

*1072 "1 The employers have conceded that Skilstaf, Inc., was the employee's `general employer' and that Clear Creek Transportation, Inc., was the employee's `special employer.' See generally Terry v. Read Steel Prods., 430 So.2d 862, 865 (Ala.1983).
"2 The employers have also challenged the sufficiency of the trial court's findings and conclusions under § 25-5-88, Ala.Code 1975; however, while the trial court does treat certain issues in a somewhat summary fashion in its five-page judgment, that court substantially complied with that statute so as to warrant our review on the merits. See Dees v. Daleville Florist, 408 So.2d 155, 156 (Ala.Civ.App.1981) (`Substantial compliance with [§ 25-5-88] will suffice.').
"3 Butler testified that each potential opening located for a particular injured employee required between 90 and 100 telephone calls by RES personnel to prospective employers."
Because, as the foregoing demonstrates, I would reverse the trial court's judgment, I respectfully dissent.
CRAWLEY, J., concurs.
NOTES
[1] This case was originally assigned to another judge on this court and was recently reassigned to this judge.
[2] The employers have conceded that Skilstaf, Inc., was the employee's "general employer" and that Clear Creek Transportation, Inc., was the employee's "special employer." See generally Terry v. Read Steel Prods., 430 So.2d 862, 865 (Ala.1983).
[3] The employers also have challenged the sufficiency of the trial court's findings and conclusions under § 25-5-88, Ala.Code 1975; however, while the trial court does treat certain issues in a somewhat summary fashion in its five-page judgment, that court substantially complied with that statute so as to warrant our review on the merits. See Dees v. Daleville Florist, 408 So.2d 155, 156 (Ala.Civ.App. 1981) ("Substantial compliance with [§ 25-5-88] will suffice.").